## SPIRES et al. v. SOUTHERN RY. CO.

### No. 6563.

United States Court of Appeals Fourth Circuit.

Argued April 14, 1953.

Decided May 16, 1953.

Edward E. Lane and E. Neil Rogers, Richmond, Va. (Lane & Rogers, Richmond, Va., on brief), for appellants.

Thomas B. Gay, Richmond, Va., and Clarence E. Weisell, Cleveland, Ohio (H. Merrill Pasco, Robert P. Buford, Jr., and Robert G. Butcher, Richmond, Va., on brief), for appellees.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

PARKER, Chief Judge.

This is an appeal from an order dismissing a suit for lack of jurisdiction. Plaintiffs are thirteen engineers and firemen employed by the Southern Railway Company.

3. See, also, Miller v. Miller, 94 Cal.App.2d 785, 211 P.2d 357, 360.

Defendants are that company, the Brotherhood of Locomotive Engineers and the local chapter of the Brotherhood at Richmond, Virginia. The purpose of the suit is to obtain a declaratory judgment as to seniority rights with respect to the operation of a certain freight train and an award of damages on account of loss of seniority rights resulting from action of the railroad taken at the instance of the Brotherhood.

The controversy concerns the rights of engineers with respect to the operation of a freight train known as the "stone train" from the South Richmond yards to the nearby station of Bon Air, near which stone quarries that have now been abandoned were formerly operated. The operation of this train, extending beyond the yard limits, was the subject of an agreement between the railroad and its employees in the year 1916 to the effect that the position of engineer thereon would be available only to engineers having seniority in road service, although it is said that all other jobs on the train were classified as yard jobs. In January 1951, at the request of the Brotherhood, which is the accredited bargaining representative of both yard and road engineers, the railroad agreed to modify the existing practice and reclassified the position of engineer on this train as a yard job available only to engineers with seniority in yard service. Plaintiffs, who have only road seniority, protested the change and caused a grievance to be filed in their behalf by the Brotherhood of Locomotive Firemen and Enginemen with the railroad's superintendent at Richmond. Upon his declining the grievance, it was taken by successive appeals to the general manager and to the vice president in charge of personnel, who also declined it. No attempt was made to seek redress from the National Railroad Adjustment Board either by the plaintiffs or by the Brotherhood of Locomotive Firemen and Enginemen, which had been representing them in the presentation of the grievance to the officers of the railroad; but this suit was instituted in the court below and complaint was filed therein alleging that plaintiffs had been deprived of seniority rights by the railroad's action, and that such action had been brought about as a result of pressure exerted by the local chapter of the Brotherhood of Locomotive Engineers, which, it was alleged, had acted "deliberately and maliciously * * * for the benefit of its members and to the detriment of plaintiffs". The trial judge dismissed the suit on the ground that plaintiffs had not exhausted their administrative remedies, basing his decision on Slocum v. Delaware, L. & W. R. Co., 339 U.S. 239, 70 S.Ct. 577, 94 L.Ed. 795, which he distinguished from Steele v. Louisville & N. R. Co., 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173, in that the decision in the latter was based upon racial discrimination, not present in the Slocum case nor in the case at bar. We think that this action was unquestionably correct.

The Railway Labor Act was passed to provide for the settlement of "all disputes growing out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions". 45 U.S.C.A. § 151a. By section 3 of the act, the National Railroad Adjustment Board was created and was expressly given jurisdiction over disputes involving train and yard service employees, including engineers and firemen. 45 U.S.C.A. § 153(h). By subsection (i) of that section, 45 U.S.C.A. § 153(i), it was provided:

"(i) The disputes between an employee or group of employees and a carrier or carriers growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions, including cases pending and unadjusted on June 21, 1934, shall be handled in the usual manner up to and including the chief operating officer of the carrier designated to handle such disputes; but, failing to reach an adjustment in this manner, the disputes may be referred by petition of the parties or by either party to the appropriate division of the Adjustment Board with a full statement of the facts and all supporting data bearing upon the disputes."

The case here deals with the manning of a particular job as between road men and

yard men and clearly deals with working rules or conditions. It does not involve the discharge of plaintiffs, or the violation of any contract which they have with the railroad, or the denial of any right belonging to them as citizens. The only rights which they claim to have been violated are seniority rights arising out of the collective bargaining agreement of 1916, which were, of course, subject to modification by subsequent collective bargaining agreements. Their real grievance is that they claim to have been treated unfairly in the collective bargaining agreement which was entered into with the railroad by the bargaining agent which represented them; and it is perfectly clear that the Adjustment Board has been given exclusive jurisdiction of grievances of this character.

A very similar case arose in Order of Railway Conductors v. Pitney, 326 U.S. 561, 66 S.Ct. 322, 324, 90 L.Ed. 318, where an agreement was made that certain trains theretofore manned by road conductors should thereafter be manned by yard conductors. In holding that relief from an alleged grievance arising out of this agreement must first be sought from the Adjustment Board before application could be made to a court before which a reorganization proceeding in bankruptcy was pending, the Supreme Court said:

"Congress has specifically provided for a tribunal to interpret contracts such as these in order finally to settle a labor dispute. Section 3 First (i) of the Railway Labor Act provides that disputes between a carrier and its employees 'growing out of * * * the interpretation or application of agreements concerning rates of pay, rules, or working conditions * * * may be referred by either party to * * * the Adjustment Board.' The Board can not only order reinstatement of the employees, should they actually be discharged, but it can also under § 3, First (o) and (p) grant a money award subject to judicial review with an allowance for attorney's fees should the award be sustained. Not only has Congress thus designated an agency peculiarly competent to handle the basic question here involved, but as we have indicated in several recent cases in which we had occasion to discuss the history and purpose of the Railway Labor Act, it also intended to leave a minimum responsibility to the courts. * * * The factual question is intricate and technical. An agency especially competent and specifically designated to deal with it has been created by Congress. Under these circumstances the court should exercise equitable discretion to give that agency the first opportunity to pass on the issue."

The case of Slocum v. Delaware, L. & W. R. Co., 339 U.S. 239, 70 S.Ct. 577, 579, 94 L.Ed. 795, relied upon by the court below, is directly in point. In that case the railroad sought a declaratory judgment as to the scope of agreements which it had entered into with two labor unions, each of which claimed for its members certain jobs with the railroad. In holding that the court had no jurisdiction of the controversy and that exclusive jurisdiction was in the Adjustment Board, the Supreme Court said:

"The first declared purpose of the Railway Labor Act is 'To avoid any interruption to commerce or to the operation of any carrier engaged therein'. 48 Stat. 1186 (§ 2), 45 U.S.C. § 151a, 45 U.S.C.A. § 151a. This purpose extends both to disputes concerning the making of collective agreements and to grievances arising under existing agreements.

* * * * * *

"In this case the dispute concerned interpretation of an existing bargaining agreement. Its settlement would have prospective as well as retrospective importance to both the railroad and its employees, since the interpretation accepted would govern future relations of those parties. This type of grievance has long been considered a potent cause of friction leading to strikes. It was to prevent such friction that the 1926 Act provided for creation of various Adjustment Boards by voluntary agreements between carriers and workers. 44 Stat. 578. But

this voluntary machinery proved unsatisfactory, and in 1934 Congress, with the support of both unions and railroads, passed an amendment which directly created a national Adjustment Board composed of representatives of railroads and unions. 48 Stat. 1189–1193. The Act thus represents a considered effort on the part of Congress to provide effective and desirable administrative remedies for adjustment of railroad-employee disputes growing out of the interpretation of existing agreements. The Adjustment Board is well equipped to exercise its congressionally imposed functions. Its members understand railroad problems and speak the railroad jargon. Long and varied experiences have added to the Board's initial qualifications. Precedents established by it, while not necessarily binding, provide opportunities for a desirable degree of uniformity in the interpretation of agreements throughout the nation's railway systems. * * * We hold that the jurisdiction of the Board to adjust grievances and disputes of the type here involved is exclusive."

See also Order Railway Conductors v. Southern Railway Co., 339 U.S. 255, 70 S.Ct. 585, 94 L.Ed. 811; Brotherhood of Locomotive Firemen and Enginemen v. Central of Georgia Ry. Co., 5 Cir., 199 F.2d 384; Starke v. New York, C. & St. L. R. Co., 7 Cir., 180 F.2d 569, 573. The case last cited sufficiently answers the argument made by plaintiffs here to the effect that they cannot depend upon their bargaining agent to represent them before the Adjustment Board. The Court said:

"An extraneous matter not shown by the complaint upon which plaintiff places much reliance is his statement that his grievance over the course of the years had been frequently brought to the attention of the officers of his bargaining representative and because of their refusal to act in his behalf he was cut off from access to the Railroad Adjustment Board. This assertion, however, if it had been alleged would not have strengthened plaintiff's cause for the reason that his remedy was not dependent upon action by the agency which represented the employees but he was entitled either personally or by attorney to present his grievance to the Adjustment Board where all the parties interested in the dispute are entitled to notice, hearing and to participate. See Elgin, Joliet & Eastern Railway Co., [v. Burley], supra, 325 U.S. [711] at pages 727 and 732, 65 S.Ct. 1282 [89 L.Ed. 1886]. Congress having specifically conferred upon the Adjustment Board the authority to hear and determine plaintiff's grievance, it is not in the absence of express language to be implied that it also intended to confer jurisdiction upon the courts. Such a holding, as a reading of the above cases abundantly discloses, would seriously impair if not destroy the usefulness of the Act and the purpose which Congress sought to achieve."

Plaintiffs rely upon Steele v. Louisville & N. R. Co., 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173, and Brotherhood of Railroad Trainmen v. Howard, 343 U.S. 768, 72 S.Ct. 1022, 96 L.Ed. 1283; but both of those cases dealt with racial discrimination, as to which the courts were well qualified to grant relief and which involved none of the matters of collective bargaining which the Adjustment Board was set up to handle. The distinction between the racial discrimination dealt with in these cases and the sort of discrimination charged here was adverted to in the Steele case in the following language where, after stating that it was the duty of the bargaining representative to exercise fairly the power conferred upon it, the court said [323 U.S. 192, 65 S.Ct. 232]:

"This does not mean that the statutory representative of a craft is barred from making contracts which may have unfavorable effects on some of the members of the craft represented. Variations in the terms of the contract based on differences relevant to the authorized purposes of the contract in conditions to which they are to be applied, such as differences in seniority, the type of work performed,

the competence and skill with which it is performed, are within the scope of the bargaining representation of a craft, all of whose members are not identical in their interest or merit."

Where the statutory representative makes contracts of the sort here involved having unfavorable effects upon some members of the craft who present a grievance on that account, it is the Adjustment Board which has jurisdiction of the controversy, and not the courts; for, as we have seen, it was just this sort of controversy that the Adjustment Board was created to handle.

Affirmed.