361 F.2d 137
 Charles THOMPSON et al., each of them individually and on
Behalf of all other persons similarly situated,
Plaintiffs-Appellants,
v.
The NEW YORK CENTRAL RAILROAD COMPANY, the Brotherhood of
Railway Carmen of America, and New York City Lodge
1085 of the Brotherhood of Railway
Carmen of America, Defendants-Appellees.
 No. 215, Docket 30105.
 United States Court of Appeals Second Circuit.
 Argued Jan. 12, 1966.
Decided May 17, 1966, Rehearing Denied June 24, 1966.
 
 Burton H. Hall, New York City (Ira Gammerman and Bromsen & Gammerman, New York City, on the brief), for plaintiffs-appellants.
 James L. More, New York City (Gerald E. Dwyer, New York City, on the brief), for defendant-appellee, The New York Central Railroad Co.
 David T. Gibbons, New York City, for defendant-appellee, New York City Lodge 1085 of the Brotherhood of Railway Carmen of America.
 Before LUMBARD, Chief Judge, and MEDINA and KAUFMAN, Circuit Judges.
 MEDINA, Circuit Judge.
 
 
 1
 In this action by certain employees of New York Central Railroad, located at Grand Central Terminal, against the Railroad and their Brotherhood collective bargaining agent and their local Lodge 1085, it was charged that a certain agreement of August 18, 1965, between the Railroad and the Brotherhood amounted to a discrimination against the employees at Grand Central Terminal. The first count of the complaint asserted that the terms of transfer of certain work from Mott Haven Yard to Grand Central Terminal granted 'super-seniority' to the transferred Mott Haven Yard men to the detriment of plaintiffs, in violation of the duty of the Brotherhood fairly to bargain on behalf of all the employees it represents, and that in accomplishing this end the officers of the Brotherhood 'agreed, colluded and conspired' with the Railroad. The second count alleged the same 'super-seniority' as the imposition of 'discipline,' in violation of the Labor-Management Reporting and Disclosure Act of 1959, 29 U.S.C. 412, 529, for failure to afford plaintiffs the procedural safeguards prescribed by the terms of the statute. The action was designed to prevent the names of the men to be transferred from the Mott Haven Yard from being added to the Grand Central Terminal seniority roster except at the bottom. So, before the date of transfer, plaintiffs moved for a preliminary injunction restraining the Railroad from putting the dove-tailing seniority plan into effect, and the Railroad made a cross-motion to dismiss the complaint under F.R.Civ.P. 12(b)(6) and 12(b)(1). The Brotherhood was not made a party to these proceedings, as neither the motion papers on the application for the temporary injunction nor those supporting the cross-motion to dismiss were served on the Brotherhood or its counsel. The result was an order: (1) denying the motion for a preliminary injunction; (2) dismissing the first count of the complaint 'with prejudice' for failure to state a claim for relief; and (3) dismissing the second count for lack of subject matter jurisdiction. Judge Levet's memorandum opinions are not reported. Plaintiffs appeal, and a certificate under F.R.Civ.P. 54(b) makes it proper for us to consider the order appealed from in its entirety.
 
 
 2
 As every phase of the controversy was thoroughly explored in the affidavits in support of and in opposition to the motion for a temporary injunction, and all the relevant documents were before the Court below, we think the motion to dismiss under Rule 12(b)(6) should have been treated as a motion for summary judgment.[1] When the chronology is straightened out and the sequence of events is described, including the various collective bargaining agreements that preceded the one of August 18, 1965, it clearly appears that many questions of interpretation of various provisions in the series of collective bargaining agreements lie at the base of what plaintiffs allege as 'discrimination' against them, that the decision of these questions was within the exclusive competence of the appropriate Adjustment Board, and that summary judgment should have been granted dismissing the first count of the complaint for lack of jurisdiction over subject matter. The August 18, 1965 agreement, which lies at the very center of the case, was merely one of a series of agreements implementing prior collective bargaining agreements in specific instances where work was to be transfered, abandoned, contracted out or similarly adjusted. We have decided: (1) summary judgment should have been granted dismissing as against the Railroad the first count of the complaint, based upon alleged discrimination in violation of the Railway Labor Act, for lack of subject matter jurisdiction; (2) the second count was properly dismissed as against the Railroad as matter of law for lack of subject matter jurisdiction; and (3) the motion for a temporary injunction was properly denied.
 
 I.
 
 3
 Prior to 1962, except where a shop or repair facility was wholly discontinued, the various successive collective bargaining agreements did not permit the Railroad to accredit transferred employees, whether following their work or not, with seniority accumulated at their last locality of employment. The requirement was that such transferees be treated as junior employees in respect of length of service at the point to which they were transferred.[2]
 
 
 4
 In 1962 a new agreement was negotiated by the nonoperating unions with the Railroad. It required 60 days' notice to union officials when work was proposed to be transferred, with a provision for discussion of the matter before the change was made. If any new jobs were to be created at the location to which work was transferred, the employees at the original location had first rights to these jobs, according to seniority; and transferred employees were to be 'included on the appropriate seniority roster at the new location with full seniority effective with the date of assignment.' This procedure of dove-tailing seniority was apparently adopted without protest. The 1962 contract also prescribed certain pay guarantees for transferred employees and unemployment insurance benefits for men whose low seniority prevented them from obtaining new jobs at the transferee location. This agreement, dated April 3, 1962, was to 'become effective February 1, 1962 and will continue in effect thereafter subject to the provisions of the Railway Labor Act as amended.'
 
 
 5
 In 1964, a mediation agreement was negotiated at Washington, D.C., between the shop crafts unions, including the carmen's union, and the major United States rail carriers, including New York Central.
 
 
 6
 Provision is made in the 1964 agreement for notice by a carrier of its intention to transfer work between locations and for discussions with the employees' representative concerning such proposed transfer. Any employee continued in service after a particular 'coordination' is assured that he will not be placed in a worse position with respect to compensation and rules governing working conditions than he occupied at the time of the 'coordination,' this guarantee to continue for up to 5 years. On the other hand, an employee who is 'deprived of employment' as a result of a 'coordination' is provided with a 'dismissal allowance' equal to 60% Of his average monthly compensation over the previous twelve months, and the duration of these monthly payments, up to a maximum of 60 months, is keyed to length of service. An employee is considered 'deprived of employment' and entitled to this 'coordination' allowance:
 
 
 7
 1. When the position which he holds on his home road is abolished as result of coordination and he is unable to obtain by the exercise of his seniority rights another position on his home road or a position in the coordinated operation, or 2. When the position he holds on his home road is not abolished but he loses that position as a result of the exercise of seniority rights by an employee whose position is abolished as a result of said coordination, or by other employees, brought about as a proximate consequence of the coordination, and if he is unable by the exercise of his seniority rights to secure another position on his home road or a position in the coordinated operation.
 
 
 8
 (Article I-- Employee Protection, Section 6(c).)
 
 
 9
 Section 11 of Article I, which deals with transfer of work procedures, is most significant, in the context of the facts of this case:
 
 
 10
 When positions are abolished as a result of changes in the carrier's operations * * * and all or part of the work of the abolished positions is transferred to another location or locations, the selection and assignment of forces to perform the work in question shall be provided for by agreement of the General Chairman of the craft of crafts involved and the carrier establishing provisions appropriate for application in the particular case; provided however, that under the terms of the agreement sufficient employees will be required to accept employment within their classification so as to insure a force adequate to meet the carrier's requirements. In the event of failure to reach such agreement, the dispute may be submitted by either party for settlement as hereinafter provided.
 
 
 11
 What this means is that, in specific instances of 'coordinations' under the 1964 national agreement, separate implementing agreements are to be negotiated by and between the General Chairman of the craft involved and the carrier regarding the details of each 'coordination,' subject to the over-all policies described in the master agreement.
 
 
 12
 This brings us to the agreement of August 18, 1965, which appellants assert is invalid by reason of discrimination. In compliance with the provisions of the 1964 agreement, and on July 16, 1965, the Railroad gave notice to five affected unions of a plan to transfer the terminal servicing of five trains from its Mott Haven Yard in the Bronx to Grand Central Terminal. The Railroad proposed to reduce the work force at Mott Haven by 107 men, including 69 carmen, helpers and cleaners, and to establish 81 new positions at Grand Central Terminal, 52 of which were carmen, helpers and cleaners. Similar notices were posted on bulletin boards for the information of all the employees. In further compliance with the national agreement, union and railroad representatives met to negotiate the terms of the proposed transfer. The result of these negotiations was the contract, dated August 18, 1965, between the Railroad and the Brotherhood of Railway Carmen and the Sheet Metal Workers International Association.
 
 
 13
 After stipulating the number of jobs to be transferred,[3] the agreement prescribed the following procedure for filling them. Qualified bidders at Mott Haven were to have preference to the new positions, in order of seniority. If any positions were not bid in by the Mott Haven men, the Grand Central Terminal employees were then eligible for them. Most importantly, Section IV provided:
 
 
 14
 Employees transferring to Grand Central Terminal hereunder will be included on the appropriate seniority roster with full seniority, effective with the date of assignment. Simultaneously, such employee's seniority, at Mott Haven will be terminated.
 
 
 15
 And most of the provisions of the 1964 national agreement were expressly made applicable to the transfer.
 
 
 16
 The dove-tailing of seniorities is what appellants characterize as 'super-seniority.' This is alleged to constitute discrimination because some of the 173 car cleaners, repairmen and helpers employed at Grand Central Terminal, the appellants, had been transferred to Grand Central Terminal from other facilities prior to 1962, in accordance with the practices outlined in Rule 29 of the pre-1962 agreements.[4] The claim is that the newly transferred men are receiving preferential treatment and that this may result in a loss of jobs by some of the appellants when work is cut back.[5]
 
 
 17
 As the August 18, 1965 agreement was to take effect on September 18, 1965, this action was commenced on September 17, 1965, and Judge Herlands, having denied an ex parte application for a temporary restraining order, signed an order to show cause which brought on for hearing before Judge Levet the motion for a preliminary injunction to which reference has been made. By cross-motion for dismissal of the complaint, also above referred to, the entire controversy, except insofar as it affected the brotherhood which was not a party to these proceedings because not served with any of the motion papers, came before Judge Levet for determination.
 
 II.
 
 18
 Whether the District Court had jurisdiction of the first alleged claim for relief depends upon whether disposition of that claim turns on questions of interpretation or application of the terms of the various agreements or solely upon the validity or invalidity of the agreement of August 18, 1965. See Cunningham v. Erie R.R. Co., 2 Cir., 1959, 266 F.2d 411; Westchester Lodge 2186, Bhd. of Ry. S.S. Clerks, etc. v. Railway Express Agency, Inc., 2 Cir., 1964, 329 F.2d 748; Roberts v. Lehigh & N.E.Ry., 3 Cir., 1963, 323 F.2d 219, 222-223; Colbert v. Brotherhood of R. R. Trainmen, 9 Cir., 1953, 206 F.2d 9, cert. denied, 1954, 346 U.S. 931, 74 S.Ct. 320, 98 L.Ed. 422. Compare Brotherhood of R.R. Trainmen v. Howard, 1952, 343 U.S. 768, 72 S.Ct. 1022, 96 L.Ed. 1283.
 
 
 19
 In limine it is to be noted, as it was by Judge Levet, that the complaint, in the first claim, does not allege 'any act or failure to act on the part of the New York Central violating any right of the plaintiffs.' In the light of the evidence fully set forth in the affidavits in support of and in opposition to the motion for a temporary injunction, the allegation that the Railroad 'agreed, colluded and conspired' means no more than that it signed the agreement of August 18, 1965; and the allegation that the dovetailing of seniorities was 'arbitrarily, capriciously and in bad faith' designed to confer 'certain special, unfair and undeserved advantages in seniority rights' upon the transferred Mott Haven Yard employees means no more than that the provisions requiring such dove-tailing are alleged not to be in accordance with the uniform practice since 1962. That one or more of the officers of the union were affected by the dove-tailing would seem to be inevitable and of no particular significance. In any event, there is no plain, unequivocal allegation that the Railroad participated in any deliberate, hostile discrimination, see Brotherhood of R. R. Trainmen v. Howard, supra, 343 U.S. 768, 72 S.Ct. 1022, and not a shred of proof to indicate that the Railroad did so. The prayer for relief is an injunction permanently enjoining the Railroad from adding any person to the seniority roster at Grand Central Terminal other than at the bottom of such roster, nominal damages of $1, and other 'appropriate' relief.
 
 
 20
 Of the questions that are decisive of appellants' claim of so-called 'discrimination,' and that are for the Adjustment Board[6] and not for the courts to pass upon, the principal one is whether the dove-tailing expressly provided for in the agreement of August 18, 1965 'was required by and expressly incorporates the terms of the national 1964 Agreement,' as the Railroad insists. The same idea is conveyed in another part of the Railroad's brief by the statement that the job security protection afforded under the prior local 1962 agreement 'was expressly carried forward under the national agreement.' Of course, if this is so, there is plainly nothing in appellants' first claim. For, if the accumulated seniority of those moved from one facility of the Railroad to another in instances where work was to be transferred, abandoned, contracted out or similarly adjusted, collectively referred to as 'coordinations,' was specifically and deliberately preserved in the 1964 agreement, as it undoubtedly was in the 1962 agreement, the charge of discrimination would fall of its own weight. Neither the Adjustment Board nor the courts would be likely to regard dove-tailing as discriminatory in regard to these appellants when the same method was absolutely required in the case of all similar coordinations throughout the entire country. In other words, while appellants consider it 'fair' treatment to put the Mott Haven Yard men at the bottom of the Grand Central Terminal roster and to eliminate entirely the seniority rights that had accrued at the Mott Haven Yard, other persons, viewing the matter objectively, would very likely think otherwise, especially if the representatives of the railroads in general and the representatives of railway employees as well thought such treatment was not 'fair' and by common consent had abrogated the old pre-1962 Rule 29.
 
 
 21
 However, we do not think the 1964 agreement is as clear on this point as the Railroad says it is. On the contrary, this would seem to be precisely the sort of question reserved for decision by the Adjustment Board, with its expertise in such matters and its familiarity with all types of collective bargaining agreements affecting the railroads and their employees.[7]
 
 
 22
 Despite what the Railroad says, we are unable to find any part of the 1964 agreement expressly carrying forward the dove-tailing rpovisions of the 1962 agreement. But, in the light of the various implementing agreements on the same subject affecting other crafts, we think it not improbable that the Adjustment Board will arrive at the same result by an interpretation of the following portion of Article I, Section 1 of the 1964 agreement:
 
 
 23
 Any job protection agreement which is now in effect on a particular railroad which is deemed by the authorized employee representatives to be more favorable than this Article with respect to a transaction such as those referred to in Section 2 hereof, may be preserved as to such transaction by the representatives so notifying the carrier within thirty days from the date of receipt of notice of such transaction, and the provisions of this Article will not apply with respect to such transaction.
 
 
 24
 Other contentions of appellants would seem to do no more than raise questions of interpretation of a similar character. For example, much is said by appellants on the subject of the vast sums the Railroad may save as a result of the alleged discriminatory dove-tailing. It is at least arguable, however, that coordination allowances pursuant to the terms of the 1964 agreement, quoted in Part I of this opinion, would be available not only to those Mott Haven Yard men who do not secure employment at Grand Central Terminal (Article I, Section 6(c), paragraph 1) but also to Grand Central Terminal men who may ultimately be out of employment by reason of the 'super-seniority' of the Mott Haven Yard transferees, as this might well be considered 'a proximate consequence of the coordination' (Article I, Section 6(c), paragraph 2). But these questions we think are reserved for determination by the Adjustment Board and not by the courts. It is also claimed that more men were transferred from the Mott Haven Yard to Grand Central Terminal than were necessary to service the five trains, and that this was done for the purpose of accommodating a union official who would not have been included if less men had been transferred. Here again we have a question of the interpretation or application of a provision or provisions of the agreement.
 
 
 25
 Thus, while Judge Levet's analysis, based on the face of claim one of the complaint alone, is sound, the views thus expressed seem to us to be considerably clarified and substantiated in the light of the proofs submitted in connection with the motion for a preliminary injunction. In the light of these proofs it is perfectly clear that the question of discrimination vel non depends upon the interpretation to be given to the 1964 agreement, as implemented by the August 18, 1965 agreement, and that this question of interpretation must be made by the Adjustment Board and not by the courts. Except for a possible, and we think very unlikely, misinterpretation by both the representatives of the Railroad and those of the Brotherhood, there is nothing to indicate any discrimination whatever, hostile or otherwise.[8] Thus it is much more satisfactory, when the circumstances permit, as they do here, to treat the motion to dismiss under F.R.Civ.P. 12(b)(6) as a motion for summary judgment.
 
 
 26
 But Judge Levet did not treat the motion to dismiss as a motion for summary judgment. Does this prevent this Court on appeal from doing what should have been done in the Court below? We think not. Indeed, this very procedure has already been followed in this Circuit in Compania De Remorque Y Salvamento, S.A. v. Esperance, Inc., 1951, 187 F.2d 114, 117 n. 1. See also Larsen v. American Airlines, Inc., 2 Cir., 1963, 313 F.2d 599; Nozet v. District of Columbia, 1962, 112 U.S.App.D.C. 143, 300 F.2d 735; 2 Moore's Federal Practice, page 2256 (2nd ed. 1965).
 
 
 27
 The principle is the same as the one we stated in 1961 in connection with the granting of summary judgment even though no cross-motion for summary judgment had been made or considered by the District Court. This principal is (291 F.2d at page 505) that when 'the evidence of the facts bearing on the issues arising out of the complaint is all before the court in affidavit form, it is most desirable that the court cut through mere out-worn procedural niceties' and make the same decision as would have been made if the Court hearing the motion to dismiss had treated the motion as one for summary judgment as directed in F.R.Civ.P. 12(b). In other words, instead of speculating on the subject of the meaning of allegations on their face vague, ambiguous and for various reasons unsatisfactory, the District Court, having all the evidence before it on the motion for a preliminary injunction, will look at these proofs to determine whether there is any 'genuine issue as to any material fact' and whether a party is 'entitled to a judgment as a matter of law.' F.R.Civ.P. 56(c). If, as here, it is found that the District Court lacks jurisdiction because the power to decide this particular dispute is reserved by an Act of the Congress for disposition by the appropriate Adjustment Board, then it does appear that a party is entitled to judgment as a matter of law and that judgment is one dismissing the particular claim for lack of jurisdiction. Viewing the matter backwards, as it were, this is doing no more than the District Court or this Court is duty bound to do sua sponte whenever it appears that jurisdiction over subject matter is lacking.
 
 III.
 
 28
 Appellants' second claim for relief was properly dismissed for lack of subject matter jurisdiction in the District Court. The theory of this second claim is that the granting of the so-called 'super-seniority' to the Mott Haven Yard men was a species of 'discipline' imposed on the Grand Central Terminal employees by way of revenge or 'reprisal' for acts of the Grand Central Terminal employees who are alleged to have been critical of the officers of the Brotherhood and of the local Lodge 1085 because of certain increases in dues and 'financial malpractices.' As in the first claim for relief, the Railroad is alleged to have 'agreed, colluded and conspired' to effect this discipline. As there were no 'written specific charges,' no 'reasonable time to prepare his defense,' and no 'fair hearing' prior to the negotiation of the agreement of August 18, 1965, there is supposed to be a violation of the Union Bill of Rights provisions of the Labor-Management Reporting and Disclosure Act, specifically 29 U.S.C. 411(a)(5) and 529.
 
 
 29
 While jurisdiction of actions by persons whose rights under the Act have been infringed is given to the proper District Courts 'for such relief (including injunctions) as may be appropriate,' as provided in 29 U.S.C. 412, the following sentence of Section 412 would seem to make it clear that the actions referred to are against 'a labor organization' and not against an employer. The word 'appropriate' is to be read in this context. Section 529 also refers to 'any labor organization, or any officer, agent, shop steward, or other representative of a labor organization, or any employee thereof.' Thus actions against persons in their representative capacity as officers of unions have been sustained. Johnson v. Nelson, 8 Cir., 1963, 325 F.2d 646; Cole v. Hall, E.D.N.Y.1964, 35 F.R.D. 4. See also Cox v. Hutcheson, S.D.Ind.1962, 204 F.Supp. 442.
 
 
 30
 The uniform current of authority in this Circuit has been to limit the jurisdiction of the District Courts under the Labor-Management Reporting and Disclosure Act to suits based upon allegations that a labor organization or officer or agent thereof acting in his official capacity violated the terms of the Act. Thus it has been consistently held that the Labor-Management Reporting and Disclosure Act regulates only the relationship between the union and its members and not that between an employer and his employees. See Cafero v. New York Typographical Union, S.D.N.Y.1963, 47 C.C.H.Lab.Cas. 18,267; Fogg v. Randolph, S.D.N.Y.1962, 244 F.Supp. 885, 888; Gross v. Kennedy, S.D.N.Y.1960, 183 F.Supp. 750. The legislative history of the statute confirms the correctness of these decisions. See Tomko v. Hilbert, 3 Cir., 1961, 288 F.2d 625. Rulings elsewhere are to the same effect. See Rinker v. Local No. 24, Amalgamated Lithographers, W.D.Pa.1962, 201 F.Supp. 204, appeal dismissed, 3 Cir., 1963, 313 F.2d 956; Bennett v. Hoisting & Portable Engineers, D.Or.1960, 207 F.Supp. 361; Strauss v. International Bhd. of Teamsters, E.D.Pa.1959, 179 F.Supp. 297.
 
 
 31
 Accordingly, we affirm the dismissal of the second count of the complaint for lack of jurisdiction over subject matter.[9]
 
 IV.
 
 32
 The motion for a preliminary injunction was properly denied by the District Court for failure to show that irreparable injury would result or that money damages would be insufficient should appellants ultimately prevail. This alone was sufficient basis for denial of the injunction. But in addition there was no demonstration of a likelihood of success which would warrant such provisional relief.
 
 
 33
 In view of the conclusions at which we have arrived, we find it unnecessary to discuss various other miscellaneous contentions of the parties, including the argument made by the Railroad that indispensable parties, namely the Brotherhood and the 52 Mott Haven Yard transferees, were not before the Court.
 
 
 34
 Affirmed, except that the case is remanded to the District Court for the Southern District of New York with a direction that summary judgment be entered in favor of the Railroad dismissing the first count of the complaint for lack of subject matter jurisdiction.
 
 
 35
 LUMBARD, Chief Judge (concurring in part and dissenting in part).
 
 
 36
 I agree with that part of the majority's opinion which affirms the denial of a preliminary injunction. I concur with the majority's dismissal of the Labor Management Reporting and Disclosure Act count on a different ground, but I would go further and dismiss that portion of the complaint as to all defendants. And I dissent from that portion of the opinion which remands the Railway Labor Act count to the National Railroad Adjustment Board (NRAB).
 
 I. The Railway Labor Act Count
 
 37
 In my opinion, the majority's disposition of this count is a serious departure from the trend of decisions in most circuits with respect to hostile discrimination suits against railroad unions. To unravel matters, it seems necessary to begin, not with the threshold question of the primary jurisdiction of the NRAB, but with the issues as they logically unfold by a reading of the pleadings and affidavits below.
 
 
 38
 The complaint alleged that the Brotherhood and the Lodge
 
 
 39
 'agreed, conspired and colluded with The Railroad for the purposes of discriminatorily conferring upon certain employees of The Railroad newly transferred or to be transferred to employment at Grand Central Terminal * * * preferred terminal seniority status in such employment * * * to the detriment of the job rights and seniority status of employees of The Railroad previously employed at the Grand Central Terminal.'
 
 
 40
 The complaint charged further that all the defendants had 'conspired as aforesaid arbitrarily, capriciously and in bad faith and for the wrongful purpose of arbitrarily conferring certain special, unfair and undeserved advantages in seniority rights upon certain of the said officers (of the Lodge and the Brotherhood).'
 
 
 41
 In a long line of decisions, the Supreme Court has imposed a duty upon unions that derive their representational status from the Railway Labor Act to represent all employees fairly and without 'hostile discrimination' based upon racial prejudice. E.g., Conley v. Gibson, 355 U.S. 41, 78 S.Ct. 99 (1957); Steele v. Louisville & Nashville R.R., 323 U.S. 192, 65 S.Ct. 226 (1944). This court, along with a large majority of the other circuits,[1] has held that this duty of fair representation also prohibits hostile discriminatory practices by unions not based upon race. See Cunningham v. Erie R.R., 266 F.2d 411, 415 (1959). Although recovery will not be allowed merely because a union in good faith confers disproportionate benefits on different employees, it seems clear that the complaint here states a good cause of action against the Brotherhood and the Lodge; to hold the complaint insufficient because the above-quoted passages omit the magic word 'hostile' would be a regression to the days of formalistic pleading requirements.
 
 
 42
 The above being true, it also seems clear that the Railroad was properly named a defendant, both from the prior cases which have included the employer as defendant in a hostile discrimination suit, see, e.g., Brotherhood of R. R. Trainmen v. Howard, 343 U.S. 768, 72 S.Ct. 1022 (1952); Steele v. Louisville & Nashville R. R., supra,[2] and from the allegations in the complaint that the Railroad participated in the discriminatory conspiracy. Compare Haley v. Childers, 314 F.2d 610, 617-618 (8 Cir. 1963).
 
 
 43
 Prior to answer by the defendants, plaintiffs moved by order to show cause for a preliminary injunction. In their supporting affidavits, plaintiffs further explained the basis of their suit by alleging: (1) that the dovetailed seniority rights were conferred upon a small group of employees unnecessarily because existing contracts guaranteed that no transferees could lose their jobs for a period of five years after the transfer; (2) that many of the plaintiffs had previously worked at Mott Haven with greater seniority at Mott Haven than the employees to be transferred under the 1965 agreement, and therefore that it was discriminatory to give the 1965 transferees greater seniority at Grand Central; (3) that several of the 1965 transferees were union officers who negotiated the 1965 agreement with the Railroad to punish, through lessened seniority rights and a possible loss of jobs, a group of union insurgents among the Grand Central plaintiffs; and (4) that the Railroad had agreed to transfer, at 'super seniority' status, more Mott Haven men than was necessary in order to insure that union officers did not lose their jobs because of the Mott Haven coordination. All these allegations, if proven, might support an inference of hostile discrimination with respect to the seniorty rights conferred upon the men transferred under the 1965 agreement. Moreover, the allegations of knowledge and participation by the Railroad, see especially (4) above, reinforce the propriety of making the employer a party to the suit.
 
 
 44
 The Railroad opposed the motion for a preliminary injunction, and it also moved to dismiss the complaint for lack of subject matter jurisdiction, for failure to state a claim upon which relief could be granted, and for failure to join an indispensable party (the Mott Haven transferees).[3] Federal Rules of Civil Procedure 12(b)(1), (6), and (7). In its supporting papers, the Railroad set forth the contractual history between itself and the unions and concluded both that the NRAB had primary jurisdiction of the disupte because Central was required by the 1964 National Agreement to provide dovetailed seniority in the 1965 agreement, and that the plaintiffs' allegations were insufficient to state a cause of action for discrimination by the Railroad.
 
 
 45
 I agree that Central's motions should be treated as seeking summary judgment. To decide these motions, it is necessary to note the precise contentions of the parties. Plaintiffs were not claiming a 'grievance' with their employer's interpretation of the seniority clause in the 1965 agreement; rather, they alleged, in substance, that the 1965 agreement was unlawful, at least as to its seniority provisions, because it was motivated by the hostile discrimination of the unions and the Railroad. Central, on the other hand, urged that hostile discrimination could not be established as a matter of law because the parties were required by the 1964 National Agreement to provide for dovetailed seniority in the 1965 agreement.
 
 
 46
 In my opinion, we need no help from the NRAB to decide that the 1964 agreement does not require any specific seniority provision in the 1965 implementing agreement.[4] It is also clear that the 1964 agreement does not prohibit dovetailed seniority provisions and that the 1962 agreement, which had been signed by Central and the Brotherhood, among others, indicates a change in policy toward such seniority provisions. Thus, although Central's absolute defense must fail, the plaintiffs will obviously have a difficult time establishing a case of hostile discrimination on the merits.
 
 
 47
 Why, then, did not majority not grant summary judgment for the Railroad? Because, in my opinion, they could not. As stated above, I disagree with any assertions that the complaint was somehow inadequate to state a claim against the employer. And summary judgment would have been inappropriate on the basis of these moving papers because, even if dovetailed seniority is, in the abstract, an acceptable collective bargaining provision, plaintiffs might yet establish hostile discrimination in this case by proving, for example, the allegation that too many men were intentionally transferred in the 1965 agreement to benefit union officers at plaintiff's expense.
 
 
 48
 Therefore, I disagree with the majority's hesitancy to interpret the 1964 agreement, and with their opinion that all issues will be resolved if Central establishes that its strained interpretation of that agreement is correct. Moreover, even accepting the majority's assumptions as to the above issues, I disagree with their decision that primary jurisdiction lies with the NRAB.
 
 
 49
 In the first place, if the case should proceed immediately to trial against all defendants, the proper interpretation of the 1964 agreement would not be a central issue. Rather, plaintiffs would be forced to carry the difficult burden of proving that the 1965 agreement was motivated by and was an unlawful manifestation of hostile discrimination on the part of the unions. And, even if plaintiffs put in a prima facie case on that issue, it is not clear that the meaning of the 1964 agreement would ever become an issue: Central and the unions might defend merely by showing that dovetailed seniority provisions have been adopted throughout the industry in recent years and are a perfectly fair and appropriate way of settling the difficult seniority problems created by the consolidation of railroad facilities. Thus, the majority have reached the peculiar result of conferring primary jurisdiction over the entire case[5] upon the NRAB because a potential defense to a valid complaint of hostile discrimination might involve questions of contract interpretation which, in their opinion, could be better resolved by that administrative agency.
 
 
 50
 In the second place, I do not see what meaningful action the NRAB can take with respect to this case. The Board is limited in its functions to interpreting existing contracts. There is no dispute at this time as to the meaning of the 1965 agreement; plaintiffs agree that it does confer dovetailed seniority benefits on the Mott Haven transferees. The 1964 National Agreement, on the other hand, was a mediation contract which conferred no benefits upon any specific group of employees. Therefore, even if the Board finds that the 1964 agreement did not compel the dovetailed seniority provision in the 1965 agreement, it will be powerless to give plaintiffs relief for it has no power to rule the 1965 agreement between Central and the unions invalid. Thus, the majority's result forces the plaintiffs to the time and expense of seeking an administrative arbitration remedy when it is obvious beforehand that the Board can at best give an 'advisory' opinion, and no relief, with respect to the issues underlying this lawsuit.
 
 
 51
 Finally, the structure and membership of the NRAB make it an inherently undesirable forum for the resolution of hostile discrimination disputes. The 36-member Board is composed of representatives of the railroads and the major unions representing railroad employees. 45 U.S.C. 153 First (a). The Board's jurisdiction is over grievances between railroads and their employees arising out of collective bargaining agreements in the industry. See 45 U.S.C. 153 First (i). Under the normal grievance procedure, the union acts as representative of the complaining employee before the Board. When the basis of dispute arises out of alleged mistreatment of employees by a union, the union cannot be expected to press the employees' claim vigorously and the Board is not likely to be a sympathetic forum for relief, even when, as alleged here by Central, the actual members of the present Board are not employed by either Central or the unions involved in the instant dispute.
 
 
 52
 It is true that the Board has altered its procedures to allow individual employees to press grievance claims that the unions refuse to take to the Board. See Conley v. Gibson, 355 U.S. at 47, 78 S.Ct. 99; Elgin, Joliet & Eastern Ry. v. Burley, 325 U.S. 711, 733-736, 65 S.Ct. 1282 (1945). Nevertheless, numerous commentators remain convinced that the Board is an unsatisfactory arbiter of alleged racial discrimination by the railroad unions,[6] and it seems unlikely that the administrative remedy will prove more satisfactory when the alleged hostile discrimination is not racially motivated. Under all these circumstances, I think that the practical arguments which led the Supreme Court to hold that the NRAB does not provide a suitable administrative remedy for hostile discrimination suits in Steele v. Louisville & Nashville R.R., 323 U.S. at 205-206, 65 S.Ct. 226, are controlling here.
 
 
 53
 None of the cases cited by the majority persuasively supports the finding here of primary jurisdiction in the NRAB. In suits by employees or by a collective bargaining representative against an employer, a distinction has arisen between 'major disputes,' which involve differences over the formation of bargaining agreements and are within the jurisdiction of the courts and the National Mediation Board, and 'minor disputes,' which merely involve the interpretation of existing agreements and thus are within the jurisdiction of the NRAB. See, e.g., Elgin, Joliet & Eastern Ry. v. Burley, 325 U.S. at 722-728, 65 S.Ct. 1282. But the major dispute-minor dispute distinction has never been applied to divest the courts of jurisdiction over a cognizable claim of hostile discrimination against a union. See Roberts v. Lehigh & New Eng. Ry., 323 F.2d 219, 223 (2 Cir. 1963); Thompson v. Brotherhood of Sleeping Car Porters, 316 F.2d 191 (4 Cir. 1963); Haley v. Childers, 314 F.2d 610 (8 Cir. 1963); Cunningham v. Erie R. R., 266 F.2d 411 (2 Cir. 1959). Compare Westchester Lodge 2186, etc., v. Railway Exp. Agency, Inc., 329 F.2d 748 (2 Cir. 1964); Starke v. New York, Chicago & St. L.R.R., 180 F.2d 569 (7 Cir. 1950), in which there were no allegations of hostile discrimination.
 
 
 54
 It is true that the extension of hostile discrimination jurisdiction beyond matters of racial prejudice does involve the courts in disputes which, but for the union's allegedly discriminatory conduct, might be within the NRAB's jurisdiction. But this judicial encroachment seems desirable, given the NRAB's structure and inability to police union activity.[7] Only those few circuits which have restricted the hostile discrimination concept solely to matters of race have refused to take this step. E.g., Alabaugh v. Baltimore & Ohio R.R., 222 F.2d 861 (4 Cir.), cert. denied, 350 U.S. 839, 76 S.Ct. 77, 100 L.Ed. 748 (1955), overruled in Thompson v. Brotherhood of Sleeping Car Porters, supra; Colbert v. Brotherhood of R. R. Trainmen, 206 F.2d 9 (9 Cir. 1953), cert. denied, 346 U.S. 931, 74 S.Ct. 320 (1954); Spires v. Southern Ry., 204 F.2d 453 (4 Cir. 1953).
 
 
 55
 In my opinion, therefore, to dismiss this complaint as to New York Central because of possible jurisdiction in the NRAB is an unwarranted restriction of our hostile discrimination jurisdiction. In Ferro v. Railway Exp. Agency, Inc., 296 F.2d 847 (2 Cir. 1961), this court did dismiss that portion of a hostile discrimination complaint that sought relief from the employer; however, in Ferro we expressly noted that there was no allegation that the employer itself discriminated or even had knowledge of the union's discrimination, 296 F.2d at 851,[8] and our decision did not interfere with the suit against the union, as the majority's suggestion of NRAB jurisdiction does here. See note 5 supra.
 
 
 56
 For the majority merely to have granted summary judgment in favor of Central would have been less inappropriate than the result they have reached here. However, as I think that the plaintiffs' complaint and affidavits here do not raise 'illusory' issues of hostile discrimination, compare Gainey v. Brotherhood of Ry. & S. S. Clerks, etc., 313 F.2d 318 (3 Cir. 1963) (2-1), I would hold them sufficient to require a trial against the unions and the Railroad. I therefore conclude that the trial court erred in dismissing count one of the complaint as to The New York Central.
 
 II. The L.M.R.D.A. Count
 
 57
 I concur in the majority's disposition of the second count, with respect to New York Central, although I would disagree with this result if I thought the complaint stated a good cause of action and if it might be necessary to retain the employer in order to fashion appropriate relief.[9] However, I do not think the second count states a claim for which relief may be granted under Section 101(a)(5) of the Labor Management Reporting and Disclosure Act, 29 U.S.C. 411(a)(5). Consequently, I would dismiss this portion of the complaint as to all defendants.
 
 
 58
 Section 101(a)(5),[10] one of the 'Bill of Rights' provisions of the LMRDA, 'deals only with the procedural aspects of union discipline.' Aaron, The Labor-Management Reporting and Disclosure Act of 1959, 73 Harv.L.Rev. 851, 873 (1960). On its face, this provision does not regulate the grounds upon which a union may discipline its members, nor does it specify what form the discipline must take; it only requires that before any employee is disciplined he must be given an opportunity to answer the charges of misconduct for which he is being punished.
 
 
 59
 This concern for the procedural aspects of union discipline has a long parallel at common law. On the other hand, courts have always been hestiant to regulate the substantive basis for union discipline, although, as Congress recognized, see 105 Cong.Rec. 5817 (daily ed. April 22, 1959), some control over internal union disciplining has been exercised by the judiciary. See generally Summers, Legal Limitations on Union Discipline, 64 Harv.L.Rev. 1049 (1951). By requiring procedural fairness as a matter of federal law, therefore, Congress improved the status of individual members while leaving unions free to regulate their own membership subject only to the minimal substantive controls of the common law and other labor legislation, such as 101 of the Taft-Hartley Act, 29 U.S.C. 158(b)(1).
 
 
 60
 Although a union's punitive action against a specific member is subject to some judicial scrutiny, the common law has never attempted to police a union's decision with respect to what provisions it will seek in a collective bargaining agreement with an employer. Although early drafts of the LMRDA made some attempt to regulate this decision-making process, see 101(a)(5) in S. 505, 86th Cong., 1st Sess. (1959), it seems obvious that the law as enacted made no attempt to enter into this vital area of union autonomy.
 
 
 61
 Given the above, I do not think that judicial review of a union's negotiating decisions should be indirectly accomplished by permitting an action under Section 101(a)(5) alleging that the results of negotiation constitute procedurally improper 'discipline.' In the first place, there could not be a satisfactory judicial inquiry into whether a union adopted a particular bargaining stand solely for the purpose of punishing employees; nor could the courts adequately determine whether the collective bargaining agreement contained the challenged provision as a result of such punitive union intent. In the second place, the procedural relief required under Section 101(a)(5)-- a hearing to determine whether a particular union member has been guilty of punishable misconduct-- is hardly relevant or suitable to the union's decision as to what bargaining positions it should adopt. Thus, relief granted in such case would either be an illusory benefit to the individual member or an unwise restriction on the union's freedom to negotiate.
 
 
 62
 For the above reasons, I do not think the plaintiffs' second count is actionable against any defendant. In so deciding, I do not mean to intimate that alteration of seniority rights could never constitute 'discipline' within the meaning of Section 101(a)(5). This court has twice held that union interference with employment rights under some circumstances may constitute 'discipline,' see Figueroa v. National Maritime Union, 342 F.2d 400, 406 (1965); Detroy v. American Guild of Variety Artists, 286 F.2d 75, 81 (1961). I would merely hold here that Congress did not intend to include as 'discipline' a union's securing of provisions in a collective bargaining agreement that may work some disadvantage to specific union members, regardless of the intent of the union's officers in negotiating with the employer. With respect to these situations, the individuals should be relegated to their rights under the National Labor Relations Act or the Railway Labor Act, whichever may be applicable, and under the common law.
 
 
 
 [1]
 Rule 12(b)
 * * * If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.
 
 
 [2]
 Rule 29 of the pre-1962 agreements reads as follows:
 (a) In event of a reduction of force at any point and a shortage of help existing at any other point, employees laid off will have preference over men not in the employ of the company. The appropriate officials shall notify the General Chairmen of the respective crafts of the number of men needed at point where shortages exist, the General Chairmen to notify the furloughed employees so they may take advantage of the opportunity to transfer.
 (b) Employees transferring under this rule, whether taking the place of an absentee, filling a vacancy or a new job, shall take rank behind all employees in service at the point to which transferred and will retain seniority at the point from which transferred until 30 days after date of restoration of forces at point of former employment, seniority to govern.
 
 
 [3]
 The agreement provided for the abolition of 76 positions for carmen, car cleaners, carmen helpers and sheet metal workers at Mott Haven, and for the creation of 57 new positions at Grand Central Terminal. This number of new positions was one more than the Railroad had originally proposed, as one additional opening for a sheet metal worker was created as a result of the negotiations
 
 
 [4]
 See Footnote 2 supra
 
 
 [5]
 The proofs submitted in opposition to the motion for a preliminary injunction, however, establish that implementing agreements, in the post-1964 period as well as during the years 1962-1964, uniformly provided for the preservation of full accumulated cumulated seniority in cases of 'coordination.'
 
 
 [6]
 The 1964 national agreement provides for a Shop Craft Special Board of Adjustment, set up in accordance with the Railway Labor Act, 45 U.S.C., 153, Second, which 'shall have exclusive jurisdiction over disputes between the parties growing out of grievances concerning the interpretation or application of Article I, Employee Protection * * *.' But this does not seem to cover disputes between individual employees or groups of employees, who are not 'parties' to the 1964 contract, and a carrier. Thus, the proper body to interpret the contracts in question is probably the National Railroad Adjustment Board which is empowered to handle 'disputes between an employee or group of employees and a carrier or carriers growing out of grievances or out of the interpretation or application of agreements concerning * * * rules, or working conditions * * *.' 45 U.S.C. 153, First (i)
 
 
 [7]
 There is no doubt that individual employees, such as the plaintiffs here, whose interests vis-a-vis their employer are hostile to those of their union, have standing to present grievances to the Adjustment Board, irrespective of the union's position. The discussion to the contrary in Steele v. Louisville & Nashville R.R., 1944, 323 U.S. 192, 205-206, 65 S.Ct. 226, 89 L.Ed. 173, is no longer valid. See Elgin, Joliet & Eastern Ry. v. Burley, 1945, 325 U.S. 711, 731-738, 65 S.Ct. 1282, 89 L.Ed. 1886, aff'd on rehearing, 1946, 327 U.S. 661, 66 S.Ct. 721, 90 L.Ed. 928; Conley v. Gibson, 1957, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80. See also Starke v. New York C. & St. L. R.R., 7 Cir., 1950, 180 F.2d 569, 573; Spires v. Southern Ry., 4 Cir., 1953, 204 F.2d 453; Colbert v. Brotherhood of R.R. Trainmen, 9 Cir., 1953, 206 F.2d 9, 12, cert. denied, 1954, 346 U.S. 931, 74 S.Ct. 320; Gainey v. Brotherhood of Railway, etc., Clerks, 3 Cir., 1960, 275 F.2d 342
 
 
 [8]
 As the Brotherhood was not served with copies of the motion papers, the situation we have to deal with on this appeal is anomalous. Of course the claim in count one against the Brotherhood is inextricably bound up with the claim in count one against the Railroad. It is, nevertheless, clear: (1) that the conclusory allegations of conspiracy and collusion, even if interpreted as charging 'hostile' discrimination, must fail on summary judgment because of the absence of proofs in the affidavits to support such a charge; and (2) that if the Adjustment Board interprets the 1964 agreement as compelling the implementing agreement now under attack, the whole stack of cards must fall. This inevitably affects the Brotherhood as well as the Railroad. As we have no subject matter jurisdiction over the claim against the Railroad, and the Brotherhood is not before us on this appeal, we have no power or authority to make any adjudication against the Brotherhood
 It should also be noted that, despite the implication in the dissent, Cunningham v. Erie R.R., 2 Cir., 1959, 266 F.2d 411 is not inconsistent with our decision here. Cunningham's claim against him employer was based on the breach of an explicit duty under the Railway Labor Act not to discharge a man under a union shop provision for a 'reason other than the failure * * * to tender the periodic dues * * * uniformly required as a condition of * * * retaining membership.' 45 U.S.C. 152, Eleventh. See also Cunningham v. Erie R.R., 2 Cir., 1966, 358 F.2d 640; Ferro v. Railway Exp. Agency, Inc., 2 Cir., 1961, 296 F.2d 847, 851-852. Moreover, as a general proposition, we would be inclined to agree that, in more or less integrated transactions, it is better to retain the Railroad as a party. To prolong this controversy, however, would, we think, be a waste of time for all concerned.
 
 
 [9]
 As the legal issues between appellants and the Brotherhood are not before us, and we have determined that there is no subject matter jurisdiction over the claim in the second count against the Railroad, we do not reach the question discussed in the dissent on the subject of whether contract provisions negotiated by an employer and a union bargaining representative can constitute 'discipline' within the meaning of the Sections of the Labor-Management Reporting and Disclosure Act relied upon by appellants. 29 U.S.C. 411(a)(5) and 529
 
 
 [1]
 See cases cited p. 150 infra
 
 
 [2]
 The majority's intemation to the contrary is particularly puzzling in light of Judge Medina's statement in Cunningham v. Erie R.R. Co., 266 F.2d at 416, that:
 'If the District Court has jurisdiction to proceed against the unior it is clear, we think, that it has also power to adjudicate the claim against the railroad. It would be absurd to require this closely integrated dispute to cut up into segments.'
 This passage was quoted with approval in Rumbaugh v. Winifrede R.R., 331 F.2d 530, 537 (4 Cir.), cert. denied, 379 U.S. 929, 85 S.Ct. 322, 13 L.Ed.2d 341 (1964).
 
 
 [3]
 The indispensable party issue has not been briefed and argued before this court. Unlike a grant of summary judgment, dismissal on this ground would not be an adjudication on the merits. See Fed.R.Civ.Proc. 41(b). Moreover, under Rule 19(b), the trial court could order the Mott Haven employees summoned. Thus, I see no reason to pass upon this issue
 Two other procedural issues deserve comment. First, I do not think it relevant to this appeal that the Brotherhood was not served at the time of the District Court's decision, despite the majority's possible suggestion to the contrary in footnote 8 of their opinion. It may well be that a trial could not be held were the Brotherhood not served, or that plaintiffs' motion for a preliminary injunction could properly be denied on this ground. But these are procedural matters which the trial court chose to ignore; our review should be directed solely to the lower court's decision to dismiss the complaint on the merits.
 Second, while I agree that as a procedural matter the motion to dismiss must be treated as a motion for summary judgment, see Rule 12(b), I am unwilling to place great significance on any factual insufficiencies in the plaintiffs' supporting affidavits because the trial judge did not treat the motion as one for summary judgment. In cases such as this, the trial judge should give all parties 'reasonable opportunity to present all material made pertinent to such a motion by Rule 56.' Rule 12(b). Instead, plaintiffs here only presented such affidavits as they thought necessary to warrant a preliminary injunction. Since there are both substantive and procedural differences in the content of affidavits for summary judgment and for a preliminary injunction, see Rule 56(e); 7 Moore, Federal Practice P65.04(3), at pp. 1640-41 (2 ed. 1955), I do not think this court can presume that plaintiffs would have been unable to present additional affidavits proving the presence of a triable issue of fact had they been given that opportunity by the trial court. At any rate, I think they have said enough in the papers before this court to warrant a trial.
 
 
 [4]
 Section 5 of the 1964 agreement provides, in part:
 'No employee of any of the carriers involved in a particular coordination who is continued in service shall, for a period not exceeding five years following the effective date of such coordination, be placed, as a result of such coordination, in a worse position with respect to compensation and rules governing working conditions that he occupied at the time of such coordination so long as he is unable in the normal exercise of his seniority rights under existing agreements, rules and practices to obtain a position producing compensation equal to or exceeding the compensation of the position held by him at the time of the particular coordination * * *'
 
 
 [5]
 It is not even made clear whether this is true. The unions did not join in Central's motion to dismiss, and the action is still pending as to them. Presumably, the unions may also defend their conduct on the ground that it was compelled by the 1964 agreement. Therefore, does the majority's result imply that the action against the unions, as to which the NRAB has no jurisdiction, see Conley v. Gibson, 355 U.S. at 44-45, 78 S.Ct. 99; Rumbaugh v. Winifrede R.R., 331 F.2d at 536, must be stayed or dismissed pending the plaintiffs' recourse to that agency?
 
 
 [6]
 See Aaron & Komaroff, Statutory Regulation of Internal Union Affairs, 44 Ill.L.Rev. (Nw. Univ.) 425, 433-34 (1949); Herring, The 'Fair Representation' Doctrine: An Effective Weapon Against Union Racial Discrimination?, 24 Md.L.Rev. 113, 125 (1964); Note, 36 N.Car.L.Rev. 529, 532 n. 16 (1958)
 
 
 [7]
 As I have attempted to explain above, this case does not involve an encroachment upon the NRAB's jurisdiction. Such encroachment would most often occur when plaintiffs allege hostile discrimination in a union's refusal to press a grievance against the employer before the NRAB, as in Conley v. Gibson, 355 U.S. 41, 78 S.Ct. 99 (1957). In Conley, where the employer was not joined as a defendant, the Supreme Court refused to remand to the NRAB, in part because 'the contract between the Brotherhood and the Railroad will be, at most, only incidentally involved in resolving this controversy between petitioners and their bargaining agent.' 355 U.S. at 45, 78 S.Ct. at 101. Only where an admittedly vaild contract is more than 'incidentally involved' in the resolution of a hostile discrimination suit does it seem appropriate to remand the case to the NRAB before it is tried, since a court is always free after trial to remand to the NRAB for the fashioning of appropriate relief for unlawful discrimination by the railroad. Cf. Brotherhood of R.R. Trainmen v. Howard, 343 U.S. at 775, 72 S.Ct. 1022
 
 
 [8]
 Unfortunately, the majority stresses in footnote 8 of their opinion, the alternative position of the court in Ferro, namely, that Cunningham v. Erie R.R., supra, held that the employer was a proper defendant only because there was a possible violation of the Railroad's statutory duty under 45 U.S.C. 152 Eleventh (a). 296 F.2d at 852. Such a restriction seems clearly contrary to Supreme Court decisions; for example, the railroad was retained as a defendant in Bortherhood of R.R. Trainmen v. Howard, supra, even though there was no arguable statutory prohibition against its conduct. Moreover, whenever the railroad participates in the unlawful discrimination, and where the only effective relief requires affirmative conduct by the employer, I see no good reason for not retaining it as a defendant. There was no clear indication to the contrary in Cunningham, and I would not so restrict that decision. Therefore, I would distinguish Ferro here on the ground that it involved no allegation of employer participation or knowledge
 
 
 [9]
 Compare Todd v. Joint Apprenticeship Committee, 223 F.Supp. 12 (N.D.Ill. 1963), an action against a union and others for racial discrimination in the construction of a federal government building in which the employer was retained as a defendant, despite its lack of participation in the discrimination, 'for the purpose of and only for the purpose of rendering a complete and total decree.' The Todd decision is more consistent with traditional equity principles than the majority's result here. See, e.g., Story's Equity Pleadings 72 (10th ed. 1892)
 
 
 [10]
 '(5) Safeguards against improper disciplinary action.-- No member of any labor organization may be fined, suspended, expelled, or otherwise disciplined except for nonpayment of dues by such organization or by any officer thereof unless such member has been (A) served with written specific charges; (B) given a reasonable time to prepare his defense; (c) afforded a full and fair hearing.'