Ernest E. ABRAMS et al., Plaintiffs-Appellants,

v.

The CARRIER CORPORATION, United Steelworkers of America, AFL–CIO, an Unincorporated Association, the Sheet Metal Workers International Association, AFL–CIO, an Unincorporated Association, and Sheet Metal Workers Union, Local No. 527, AFL–CIO, an Unincorporated Association, Defendants-Appellees.

No. 408, Docket 33940.

United States Court of Appeals, Second Circuit.

Argued Feb. 4, 1970.

Decided Nov. 4, 1970.

Nicholas H. Politan, Jersey City, N. J. (Krieger, Chodash & Politan, Jersey City, N. J., on the brief), for appellants.

Theophil C. Kammholz, Washington, D. C. (Stanley R. Strauss, Kenneth C. McGuiness, Washington, D. C., David W. Jasper and M. Harold Dwyer, Syracuse, N. Y., on the brief; Vedder, Price, Kaufman & Kammholz, Washington, D. C., Hancock, Ryan, Shove & Hust, Syracuse, N. Y., of counsel), for appellee Carrier Corp.

George H. Cohen, Washington, D. C. (Elliot Bredhoff, Michael H. Gottesman, Washington, D. C., and Nathan Witt, New York City, on the brief; Bernard Kleiman, Chicago, Ill., of counsel), for appellee United Steelworkers of America, AFL–CIO.

Bernard T. King, Syracuse, N. Y., Donald W. Fisher, Toledo, Ohio (Blitman & King, Syracuse, N. Y., and Mulholland, Hickey & Lyman, Toledo, Ohio, of counsel), for appellees Sheet Metal Workers' International Assn., AFL–CIO, and Sheet Metal Workers Union Local No. 527, AFL–CIO.

Before WATERMAN and ANDERSON, Circuit Judges, and BARTELS, District Judge.*

BARTELS, District Judge:

Plaintiffs appeal from an order of the United States District Court for the Northern District of New York (Port, J.) dismissing their amended complaint against all the defendants, principally upon the grounds of lack of subject-matter jurisdiction and failure to state a claim upon which relief can be granted.

Jurisdiction is alleged under Section 301 of the Labor Management Relations Act of 1947 ("LMRA"), 29 U.S.C. § 185, and Section 102 of the Labor Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C. § 412.[1]

Appellants are approximately 225 former employees of Carrier Corporation ("Carrier") at its Syracuse, N. Y. plant, who lost their jobs as a result of a labor relations imbroglio which began in the summer of 1959 and lasted beyond November 30, 1961. They lost their jobs as a consequence of a work stoppage (claimed by them to be a lockout) and picketing of the plant in connection with certain proposals made by Local Union No. 5895 of the United Steelworkers of America, AFL–CIO ("Steelworkers") and the scheduling of overtime work which resulted in, among other things, the suspension of Francis Brewster, the president of Local 5895. They were not reemployed by Carrier after the picketing ended although other employees of lesser seniority, who also picketed, were recalled to work. At various times during this period, three labor unions, Federal Labor Union No. 23983, affiliated with AFL–CIO ("FLU"), Local 5895 of Steelworkers, and Local 527 of Sheet Metal Workers' International Association, AFL–CIO ("Sheet Metal Workers"), represented Carrier's production and maintenance employees.

■ Upon these basic facts, appellants have for the second time attempted to

---

* Of the Eastern District of New York, sitting by designation.

1. Section 301 of the LMRA provides in pertinent part:

"(a) Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties."

Section 102 of the LMRDA provides in pertinent part:

"Any person whose rights secured by the provisions of this subchapter have been infringed by any violation of this subchapter may bring a civil action in a district court of the United States for such relief (including injunctions) as may be appropriate."

Plaintiffs originally invoked federal jurisdiction under 28 U.S.C. § 1332 as well, but abandoned this contention, conceding the absence of diversity. See United Steelworkers of America, AFL-CIO v. R. H. Bouligny, Inc., 382 U.S. 145, 86 S.Ct. 272, 15 L.Ed.2d 17 (1965).

state one or more claims within the jurisdiction of this court in allegations which are conclusory, vague, overlapping, and often contradictory. The district court, having dismissed the first complaint under Rule 8, Fed.R.Civ.Proc., 28 U.S.C., refused to dismiss the present complaint for the same reason, upon the ground that the allegations were sufficient to enable the defendants to file a responsive pleading. Instead, the court, in the interest of finality, probed the pleadings in a futile effort to ascertain whether the plaintiffs were entitled to relief upon the facts alleged and dismissed the complaint. We believe the interests of judicial economy might have been better served had this complaint also been dismissed as a plain violation of the explicit requirements of Rule 8, with leave to amend.[2] See Woody v. Sterling Aluminum Products, Incorporated, 365 F.2d 448 (8th Cir. 1966), cert. denied, 386 U.S. 957, 87 S.Ct. 1026, 18 L.Ed.2d 105 (1967); Koll v. Wayzata State Bank, 397 F.2d 124 (8th Cir. 1968). In setting aside the district court's disposition of the case, we have been mindful of our obligation, particularly in cases in the labor relations field, to construe the complaint most liberally in favor of the plaintiffs. Desrosiers v. American Cyanamid Company, 377 F.2d 864 (2d Cir. 1967); Local 33, International Hod Carriers Building and Common Laborers' Union of America v. Mason Tenders District Council of Greater New York, 291 F.2d 496 (2d Cir. 1961). See also Murray v. City of Milford, Connecticut, 380 F.2d 468 (2d Cir. 1967); Escalera v. New York City Housing Authority, 425 F.2d 853, 2d Cir., 1970.

The complaint is cast in the form of allegations of fact followed by a series of separate claims for wrongdoing against each defendant purportedly predicated upon those facts, which claims require separate treatment. The factual allegations may be briefly summarized as follows:

### FACTS

In 1956 appellants, former employees of Carrier, were represented by FLU, which entered into a collective bargaining agreement (hereafter referred to as "bargaining agreement") with Carrier, effective September 4, 1956, for a period of three years. By its terms this agreement (Section XXII) was subject to automatic extension for successive periods of three years each " * * * unless either party gives written notice of termination to the other party at least sixty (60) days before the end of such contract period." No such notice was ever given by either party.

On June 21, 1959, the membership of FLU voted at a special meeting to affiliate with an AFL–CIO international union, as a result of which a number of Internationals, including Steelworkers and Sheet Metal Workers, attempted to enlist the affiliation of the FLU membership. Thereafter an agreement was entered into among the international unions providing that the other Internationals would not intervene or be a party to any National Labor Relations Board ("NLRB") election in such bargaining unit after the FLU membership had voted for affiliation with a particular International. Subsequently, on July 1, 1959, the FLU membership voted to affiliate with Steelworkers and on October 2, 1959 a charter was issued by Steelworkers to FLU designating it as Local Union 5895, which charter appellants claim constituted a contract. Contrary to the agreement, the Sheet Metal Workers agitated for affiliation with the FLU membership, which culminated in Sheet Metal Workers' and Local 527's entrance into a NLRB election held on January 7, 1960, which was won, however, by Local 5895. Accordingly, on January 15, 1960, Local 5895 was certi-

---

2. In that event, there would have been no appeal to this court. Dann v. Studebaker-Packard Corporation, 253 F.2d 28 (6th Cir. 1958); Koll v. Wayzata State Bank, 397 F.2d 124 (8th Cir. 1968).

fied as "successor collective bargaining representative under the agreement entitled 'Agreement Between Carrier Corporation and AFL, Federal Union No. 23983.'" A disagreement between Carrier and Local 5895 arose in February, 1960, when Carrier entered into some sort of "campaign", pursuant to which "various proposals of the Local Union 5895" were denounced. When an extraordinary amount of overtime work was scheduled, Local 5895 voted to refuse to work overtime and to walk out if any member was disciplined for this refusal, it being claimed that Carrier was preparing for a strike or a lockout. Subsequently, on March 2, 1960, Francis Brewster was reprimanded and suspended by Carrier. On March 3, 1960, Carrier shut down its plants and thus effectuated a "lockout", which resulted in picketing on the same day by Local 5895.[3]

Later, on March 27, 1960, an agreement was reached between Local 5895 and Carrier to end the work stoppage, but this agreement was torpedoed by another dispute arising out of the announcement by Carrier that Francis Brewster would not be permitted to return to work, whereupon picketing was resumed by Local 5895. Although Carrier announced on March 28, 1960 that it would reemploy all those who wished to return to work, approximately 400–500 members (including appellants) of Local 5895 continued to picket until the middle of May, 1960. Notwithstanding a subsequent announcement by Carrier that the persons still "out on strike" should return to work, Carrier refused to allow appellants to resume employment on an equal footing with other employees and has failed to accord the ap-

pellants the rights and privileges enjoyed by them pursuant to the bargaining agreement and, accordingly, appellants have been without work since that date and have been barred from employment at Carrier's Syracuse plant although other employees of Carrier, in the same occupations but of lesser seniority, have been recalled to work.

In the meantime, Sheet Metal Workers campaigned for support among the employees with the assistance of Carrier, which culminated in a certification, on November 30, 1961, by the NLRB of Local 527 of Sheet Metal Workers as the collective bargaining agent of Carrier's employees, whereupon Steelworkers "withdrew" as appellants' representative and refused to intercede on their behalf. Moreover, Local 527 unjustifiably refused appellants membership and seniority rights based upon their employment history and their membership in Local 5895.

The claims of wrongdoing against each defendant are set forth in the complaint as follows:

### Claims Against Carrier

(1) Breach of the bargaining agreement under § 301; (2) ousting Local 5895 as the bargaining representative through a campaign of industrial warfare resulting in the withdrawal of Local 5895's charter on November 30, 1961; (3) libel and slander of appellants; (4) violation of appellants' rights under the "Bill of Rights" provisions of the LMRDA; and (5) acting in concert with Sheet Metal Workers and Local 527 to blacklist appellants to thwart their employment from May, 1960 on.

---

3. In reviewing a decision by the National Labor Relations Board involving the same facts presented here, the Supreme Court characterized the March 2, 1969 work stoppage as a "strike" called by Steelworkers after it "failed to agree [with Carrier] upon a collective bargaining contract." United Steelworkers of America, AFL–CIO v. National Labor Relations Board, 376 U.S. 492, 493–494, 84 S.Ct.

899, 901, 11 L.Ed.2d 863 (1964). This characterization, based upon NLRB findings, however, is not binding upon these plaintiffs. Cf. International Union of Electrical, Radio and Machine Workers, AFL–CIO v. General Electric Company, 407 F.2d 253, 264 (2d Cir. 1968), cert. denied, 395 U.S. 904, 89 S.Ct. 1746, 23 L.Ed.2d 217 (1969).

*Claims Against Steelworkers*

(1) Breach of contract, embodied in the charter and bylaws granted to Local 5895 by Steelworkers, under § 301, in that Steelworkers failed to represent appellants diligently, fairly, and in good faith in proceedings before the court and the NLRB arising out of the industrial strife precipitated by the March 2, 1960 lockout by Carrier, and failed to afford to the Local 5895 membership the benefits of the funds available to the International Union to assist local unions in their industrial problems with management, and abandoned appellants and other members of Local 5895 as the collective bargaining representative of the production and maintenance workers; (2) violation of appellants' rights under the LMRDA; (3) aiding and abetting Carrier in the commission of unfair labor practices within the meaning of § 8 of the National Labor Relations Act, 29 U.S.C. § 158; and (4) breach of Steelworkers' duty of fair representation.

*Claims Against Sheet Metal Workers and Local 527*

(1) Breach of the "Agreement Among the Internationals" under § 301; (2) libel and slander of appellants; (3) blacklisting appellants to thwart their employment from May, 1960 on; (4) malicious interference with appellants' property rights in a campaign of industrial warfare in concert with Carrier for appellants' loyalty to Local 5895; and (5) wrongful denial of membership in Local 527 (charged in the chronology of events but not under the heading of "wrongdoing").

*Claims Against All Defendants*

(1) Conspiracy to commit the above wrongs and interferences with appellants' rights charged substantively against the various defendants, and (2) deliberate ouster of appellants from union membership and job employment.

*Relief*

Relief is sought in the form of (1) actual damages of $25,000,000 and punitive damages of $50,000,000; (2) an injunction enjoining defendants from continuing to commit the alleged wrongs and ordering defendants Carrier and Local 527 to reinstate appellants in their jobs, along with seniority rights and membership in Local 527; (3) back pay of over $9,000,000 from March 2, 1960; and (4) payment by Steelworkers of benefits appellants should have received in protecting the rights of Local 5895 and in attempting to redress the wrongs ensuing from the lockout and other alleged misconduct.

On this appeal we are called upon to determine whether the complaint states a claim upon which relief can be granted within the jurisdiction of this court as to (a) claims against all the defendants under § 301 of the LMRA; (b) claims against Carrier and Steelworkers under § 101 *et seq.* of the LMRDA; (c) claims against Steelworkers for violation of the duty of fair representation; (d) claims arguably subject to § 7 or § 8 of the National Labor Relations Act ("NLRA") against all the defendants; (e) conspiracy against all the defendants; and (f) pendent State claims. These claims will be considered seriatim.

*§ 301 Claim Against Carrier*

■ Appellants allege that the bargaining agreement, effective September 4, 1956, was extended for a three-year period after September 30, 1959, because no notice of termination had been given by Carrier, and further allege that "Carrier Corporation deliberately and maliciously breached the Collective Bargaining Agreement to the damage of the plaintiffs." In their brief, they assert that certain specified allegations in the complaint [4] set forth a breach of contract, which appellants claim relate to denial of rights under the contract of

---

4. Paragraphs VII(g) (q) (t) (v) (x) (dd) (ff) (gg) (hh) and the entirety of paragraph VIII.

employment, lockout, denial of work opportunity, suspensions in violation of the contract, replacing appellants as employees of Carrier and blackballing. The district court found that the complaint was insufficient because these allegations failed to point out exactly how the contract was violated or which contract provisions were breached. We cannot agree with this conclusion. The appellants attached to the complaint a copy of the bargaining agreement and it is true that no specific provisions of the bargaining agreement were invoked in the complaint. But the appellants did plead a breach of the bargaining agreement which, when viewed with the other allegations of the complaint and the provisions of the agreement, precludes a dismissal of the complaint for lack of specificity. Liberally construed, the complaint essentially alleges, however inartistically, that Carrier's lockout and subsequent refusal to rehire appellants, while it rehired other employees of lesser seniority, constituted a discharge without cause, a discrimination against appellants on account of their support of Local 5895, and a loss of their seniority rights, all in violation of the bargaining agreement. Cf. O'Mara v. Erie Lackawanna Railroad Company, 407 F.2d 674 (2d Cir. 1969), affirmed sub nom., Czosek v. O'Mara, 397 U.S. 25, 90 S.Ct. 770, 25 L.Ed.2d 21 (1970).[5] We find that the specific provisions of the bargaining agreement may well be construed as prohibiting such conduct.[6] Cf. International Union of Electrical, Radio and Machine Workers, AFL–CIO v. General Electric Company, 407 F.2d 253, 264 (2d Cir. 1968), cert. denied, 395 U.S. 904, 89 S.Ct. 1746, 23 L.Ed.2d 217 (1969); Anaconda Company v. Great Falls Mill and Smeltermen's Union No. 16 of International Union of Mine, Mill and Smelterworkers, 402 F.2d 749 (9th Cir. 1968). "To require a plaintiff to set out each and every contractual fact and contention in detail before federal jurisdiction would attach under § 301 would be unreasonable and unwarranted in light of the purpose underlying § 301 and the function of the complaint in federal pleading." Chasis v. Progress Manufacturing Company, 382 F.2d 773, 777 (3d Cir. 1967). Moreover, a complaint should not be dismissed unless it appears to a certainty that no set of facts could be proven at trial entitling a plaintiff to any relief. Jenkins v. McKeithen, 395 U.S. 411, 422, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969); Conley v. Gibson, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); Dann v. Studebaker-Packard Corporation, 288 F.2d 201 (6th Cir. 1961). Applying this standard, we cannot state that the complaint is so clearly infirm as to mandate a dismissal upon this ground at so early a stage of the proceedings.

However, the district court also rested its decision upon the non-existence of the bargaining agreement. It held that (i) the agreement had not been renewed, even in the absence of the required notice, since the facts alleged were insufficient to establish an effective renewal, and (ii) the earliest breach of the agreement was in February, 1960, when it was no longer in effect. This finding was based upon the fact that August 1, 1959

5. In *O'Mara*, former employees of the Lackawanna Railroad alleged a breach of an "Implementing Agreement" between the newly-formed Erie Lackawanna and their union, predicated upon a "furlough," following which they were never recalled and in fact were replaced by former Erie Railroad employees, all of which plaintiffs claimed constituted a discharge. This court held, however, that plaintiffs must first pursue their contract remedy with the Railroad Adjustment Board, and affirmed dismissal of that portion of the complaint.

6. Section X of the bargaining agreement, headed "Discrimination and Coercion," provides in part that "[t]he Employer will not discriminate against any officer, representative or member of the Union because of any lawful activity by him on behalf of the Union." Section XI ("Discharges") provides that "[n]o employee shall be discharged by the Employer without just cause." Section XV ("Seniority") sets forth terms and conditions relating to seniority status and employee rights pursuant to such status.

was the last date upon which an automatic renewal could have been precluded and at that time a real question of representation had developed which required Carrier to maintain strict neutrality until that question was resolved by the NLRB. If this theory is valid, then Carrier was in quite a dilemma because a violation of neutrality would have also occurred had Carrier issued a notice of termination. We cannot adopt this line of reasoning because we do not believe that at that particular time Carrier was frozen from action by any "duty of neutrality." Viewing the allegations of the complaint alone, we believe that at the time Carrier was free to act or not to act and that its failure to act effectively renewed the bargaining agreement.

Whether an employer has breached a duty of neutrality is an issue generally decided by the NLRB after a full hearing upon a charge that the employer has committed an unfair labor practice in entering into a contract with a particular union while there existed a "real question of representation" among competing unions, e. g., Midwest Piping & Supply Co., Inc., 63 NLRB 1060 (1945), and whether such a question, with its concomitant duty of neutrality, exists is rarely susceptible of determination from the bare allegations of a complaint. This is particularly true in this case, where there is no explicit allegation that any conflicting claims of representation were presented to Carrier prior to August 1, 1959.

■ In finding the existence of a real question of representation, the district court relied upon a statement in Carrier's brief that a petition for representation had been filed on May 15, 1959, which, since undenied, we will assume to be true. However, the mere filing of a petition does not, in itself, warrant a finding or conclusion that a real question of representation exists. National Labor Relations Board v. Mid-

town Service Co., 425 F.2d 665, 2d Cir. 1970; National Labor Relations Board v. Swift and Co., 294 F.2d 285 (3d Cir. 1961); St. Louis Independent Packing Co. v. National Labor Relations Board, 291 F.2d 700 (7th Cir. 1961).

■ The other allegation in the complaint which might have some bearing upon this question is the assertion that Sheet Metal Workers agitated for affiliation with FLU in violation of its agreement with the other Internationals. But when this agitation occurred,[7] and what form it took does not appear from the complaint. We do know that on July 1, 1959, only a month before Carrier's alleged renewal of the bargaining agreement, FLU had voted to affiliate with Steelworkers. Under these circumstances, we cannot conclude that the general allegations of the complaint compel or justify the inference that on August 1, 1959 there was a real question concerning affiliation between Steelworkers and Sheet Metal Workers. Moreover, a contest among Internationals for affiliation with an existing independent local does not *per se* require an employer to decide that a real question of representation exists, for mere affiliation may not result in any change in the union's identity or any alteration in its status as exclusive bargaining representative. As stated by Chief Judge Parker in National Labor Relations Board v. Harris-Woodson Co., 179 F.2d 720, 723 (4th Cir. 1950):

"It was the local union which the employees chose as their bargaining representative; and the fact that they desired it to represent them in collective bargaining was not affected by its change either of name or affiliation. On the contrary, it is perfectly clear that the only purpose of these changes was that it might be enabled thereby to bargain in behalf of the employees. * * * The identity of that representative, composed entirely of the company's employees, was not changed

7. The factual allegations of paragraph VII of the complaint follow in close chronological order, and the first allegation of agitation follows that subparagraph alleg-

ing the grant of the charter to FLU in October, 1959. Hence, it must be inferred that the alleged "agitation" did not occur prior to August 2, 1959.

either by its change of name or its change of affiliation."

See also National Labor Relations Board v. Hershey Chocolate Corporation, 297 F.2d 286 (3d Cir. 1961); Continental Oil Co. v. National Labor Relations Board, 113 F.2d 473 (10th Cir. 1940), remanded on other grounds, 313 U.S. 212, 61 S.Ct. 861, 85 L.Ed. 1292 (1941); Carpinteria Lemon Association v. National Labor Relations Board, 240 F.2d 554 (9th Cir. 1956), cert. denied, 354 U.S. 909, 77 S.Ct. 1295, 1 L.Ed.2d 1427 (1957); East Ohio Gas Co., 140 NLRB 1269 (1963); North Electric Co., 165 NLRB 942 (1967). In any event, there is no allegation in the complaint that a claim for representation by Sheet Metal Workers or any other union had been presented to Carrier at the time of the alleged renewal, nor does the complaint reveal that any order for a representation election had been issued by the NLRB prior to August 1, 1959, which might have provided a reasonable basis for Carrier to assume that FLU no longer represented the majority of the employees.[8] National Labor Relations Board v. Swift and Co., *supra;* St. Louis Independent Packing Co. v. National Labor Relations Board, *supra.* Thus we cannot read into the complaint any duty of neutrality on the part of Carrier precluding it from renewing the bargaining agreement or imputing to it an intention not to renew or any facts which would warrant a conclusion that any renewal was ineffective.

Another ground for the district court's thesis for the non-existence of the contract was premised upon the rationale of Matter of American Seating Co., 106 NLRB 250, 255 (1953), where the Board said:

"But, if a newly chosen representative is to be hobbled in the way proposed by the Respondent, a great part of the benefit to be derived from the no-bar rule will be dissipated. There is little point in selecting a new bargaining representative which is unable to negotiate new terms and conditions of employment for an extended period of time."

Upon this authority, the district court hypothesized that any contract resulting from a renewal would nevertheless automatically be terminated by the certification by the NLRB on January 15, 1960 of Local 5895 as the exclusive bargaining agent of Carrier's employees. Since the earliest breach of contract alleged by appellants occurred after certification, the court concluded that the claim against Carrier must fall. We do not believe that the decision in *American Seating* supports this conclusion. *American Seating* simply held that it was an unfair labor practice for an employer to refuse to bargain with a newly certified union upon the ground that it was bound by a prior contract with a former bargaining representative. It does not follow from this reasoning that until a new agreement is reached with a new bargaining representative, the old agreement, or at least those portions thereof necessary for the continuation of the employer-employee relationship, automatically ceased to exist, provided the new bargaining representative is "kept responsive to the needs and desires of [its] constituents" (*id.*) and remains free to negotiate a new agreement. Compare John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 550, 84 S.Ct. 909, 11 L.Ed. 2d 898 (1964).

■ But more important, the reasoning of *American Seating* is inapplicable to a case where the bargaining representative before the certification retains the same identity as the bargaining rep-

---

8. Carrier argues that the automatic renewal of the FLU–Carrier contract was inconsistent with subsequent events, referring to a statement in the complaint that during the latter part of February, 1960, Carrier had denounced "various proposals of the Local Union 5895" and further, that in plaintiffs' brief it is stated that "[p]laintiffs were conducting a legitimate strike demanding a new contract * * *." These statements merely raise evidentiary issues to be decided at the trial.

resentative after the certification. The complaint alleges that Local 5895, upon certification, became the successor collective bargaining agent under the original FLU agreement, and this allegation finds support in the chronology of events as set forth in the complaint. After the bargaining agreement was allegedly renewed for an additional three-year period, FLU was issued a charter by Steelworkers in October, 1959, designating it Local 5895, United Steelworkers of America, AFL–CIO. This mere fact of affiliation, however, does not compel the conclusion that the renewed bargaining agreement at that point ceased to exist (National Labor Relations Board v. Hershey Chocolate Corporation, *supra*) or, as we have indicated earlier, that FLU lost its status as bargaining representative of Carrier's employees. In fact, both FLU and Carrier agreed that in the event of FLU's affiliation with an International, the bargaining agreement would nevertheless continue in full force and effect unless Carrier chose to terminate it, which option Carrier apparently declined to exercise.[9] Following a challenge to its status, Local 5895 was certified as the exclusive bargaining representative of Carrier's production and maintenance workers after a representation election conducted by the NLRB. In the light of the foregoing, it appears from the complaint that the election produced no change in the bargaining representative for the appellants. Viewing Local 5895 as successor to FLU under this agreement, we find that *American Seating* is inapposite, since that case involved the effect upon an existing bargaining agreement of the certification of a *new* bargaining representative.

■ There is no doubt, however, that there are serious deficiencies in the plaintiffs' complaint. Assuming as true the allegation that the bargaining agreement with Local 5895 continued in full force and effect after certification of Local 5895, appellants' failure to allege either that Local 5895 wrongfully and in bad faith refused to process their grievances pursuant to the established grievance procedure in violation of the Local's duty of fair representation, or that Carrier repudiated or refused to follow the grievance procedure, or that Carrier and Local 5895 effectively conspired to deprive appellants of their rights under the agreement, mandates a dismissal of the claim.[10] Vaca v. Sipes, 386 U.S.

---

9. Section XXI(B) of the bargaining agreement provides:

"If the Union shall change its existence or shall join or affiliate with some other organization, the Employer then or thereafter shall have the option to terminate this Agreement."

10. Section VIII of the bargaining agreement sets forth a specific procedure for the settlement of grievances, and provides as follows:

"(A) Any Employee who believes that he has a justifiable request, difference, or complaint shall—

1. See his Foreman and discuss the same in an attempt to reach an agreement

or

2. See his Foreman and request the presence of his Steward to assist in arriving at a settlement. The Foreman shall send for the Steward promptly.

(B) Any request, difference, or complaint not settled under the procedure set forth in Paragraph (A) of this section constitutes a grievance within the meaning of this section and shall be disposed of as follows:

Step 1. Any grievance as above defined shall be set forth in writing on a grievance form, in duplicate, and shall be presented to the Foreman by the Shop Steward with or without the Employee being present.

The Foreman will again review the grievance and shall endorse thereon his disposition and his reasons therefor.

If a settlement to the satisfaction of the Employee has not been arrived at under Step 1 within two (2) working days, an earnest effort will be made to settle such grievance in the following subsequent steps:

Step 2. Between the Employee and/or his Steward and whoever represents the next level of Supervision above Foreman.

Step 3. Between the Grievance Committee and a major Department Head or a representative selected by him, or at his option a Committee of four (4)

171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967); Desrosiers v. American Cyanamid Company, *supra.*

The requirement that an aggrieved employee resort to the grievance procedure is not a mere ritual or formality. It is a necessary complement to the union's status as exclusive bargaining representative, enabling it to actively participate in the continuing administration of the contract. Republic Steel Corporation v. Maddox, 379 U.S. 650, 653, 85 S.Ct. 614, 13 L.Ed.2d 580 (1965). Without it the employer and the union could not "establish a uniform and exclusive method for orderly settlement of employee grievances" (*id.*) and the underlying policy in favor of such a settlement of labor disputes would be frustrated.

It is true that paragraph IX(b) (8) of the complaint charges all the defendants, including Carrier, with conspiracy to prejudice the appellants' rights to fair representation by Steelworkers and Local 5895 "in the various proceedings before the National Labor Relations Board and the court by improper, inadequate and negligent representation furnished by the United Steel Workers of America, AFL–CIO, and by refusal or failure of United Steel Workers of America, AFL–CIO, and Local 5895 to prosecute in good faith the past and continuing grievances against the employer, Carrier Corporation, for unfair labor practices including a permanent lock out." But such claims are cast in the form of a general catch-all charge of conspiracy without reference to any specific acts or failures to act under the grievance procedure of the bargaining agreement. Into those conclusory and grammatically imperfect allegations we cannot read a wrongful failure or refusal on the part of Local 5895 to resort to the specified grievance

representing Management who shall meet within three (3) working days.

Step 4. Between the Executive Committee of the Union and an Executive Officer of the Employer.

In each step, the reasons for the decision of the Employer shall be endorsed on the grievance form.

(C) Should the Executive Committee and the Employer fail to settle such grievance, such grievance shall be submitted to arbitration for questions of fact or interpretation of this agreement before Mr. W. Albert Rill for the Union and Mr. Steward F. Hancock for the Employer. If such arbitrators agree, their decision shall be final and binding on both parties. If such arbitrators fail to agree, they may select a third arbitrator, but in case they cannot agree upon a third arbitrator then either party may apply on two (2) days' notice in writing to the Onondaga County Judge for the appointment of a third (3rd) arbitrator. The decision of a majority of said three (3) arbitrators shall be final and binding on both parties.

The Employer shall pay two-thirds and the Union one-third of the expense of arbitration.

(D) Any grievance not appealed from a decision under the first four (4) steps within five (5) working days shall be considered settled on the basis of the last decision and not subject to further appeal.

A grievance decision awarded in favor of the Employee shall be made retroactive to the date when the current grievance was formally submitted at Step 1, except in a case involving elaborate study which would prevent normal action. In such instances, the retroactivity will not exceed thirty (30) working days, plus the time spent for arbitration if this procedure is taken. No decision in one case shall create a basis for a retroactive adjustment in any other case.

(E) Rules of procedure shall be prepared from time to time by the Employer, submitted to the Executive Committee of the Union for its approval and when so approved shall govern the details of carrying out the foregoing plan for settlement of grievances.

(F) The arbitration procedure set forth in this Agreement shall not apply to matters covered by the following, unless individual cases are submitted to arbitration by mutual consent of the Employer and the Union:

Section VIII—Settlement of Differences and Grievances and Arbitration Procedure.

Section XI—Discharges.

Section XII—Wages.

Section XX—Legality.

Section XXII—Duration of Agreement."

procedures set forth in the agreement. Appellants make another attempt, in the vague allegation in paragraph XIII, to set forth a justiciable claim by charging that as a direct consequence of the combination of the wrongful actions of the defendants "plaintiffs * * * have been deprived of * * * arbitration rights and other rights and privileges provided in the Collective Bargaining Agreement." This allegation does not supply the essential elements to charge Carrier with conduct amounting to a repudiation of the grievance procedure.

But we are not certain from a reading of the multitudinous allegations of the complaint whether this deficiency is due to the inability of the appellants to allege facts sufficient to constitute the wrong or to the ineptitude of the pleader. Under the circumstances we believe that the appellants should be granted leave to amend in this respect, if they can do so, in order to state a § 301 claim against Carrier.[11]

### § 301 Claim Against Steelworkers

Relying upon that portion of § 301(a) which permits suits to be brought for violations of "contracts between such labor organizations" representing employees in an industry affecting commerce, appellants invoke the jurisdiction of this court against Steelworkers under § 301. Cf. Smith v. Evening News Association, 371 U.S. 195, 83 S.Ct. 267, 9 L. Ed.2d 246 (1962). They claim that Steelworkers "breached the contract created by the charter and by-laws granted to Local Union No. 5895." While the complaint alleges what appellants conceive to be the many obligations owed to them and to Local 5895 under the charter and by-laws as a contract,[12] neither of these documents was annexed to the complaint although the charter purports to be and obviously was intended to be so annexed. However, as an aid in determining whether such a § 301 contract has been alleged, we have considered the standard form of charter and by-laws furnished the court by Steelworkers.

The Supreme Court in Retail Clerks International Association, Local Unions Nos. 128 and 633 v. Lion Dry Goods, Inc., 369 U.S. 17, 82 S.Ct. 541, 7 L.Ed.2d 503 (1962), held that § 301 contracts are not limited solely to collective bargaining agreements but include also labor contracts other than collective bargaining agreements, as, for example, strike settlement agreements. We have been unable to find any authority holding that

---

11. In the same amendment plaintiffs should avail themselves of the opportunity to specify the provisions of the contract which they claim were violated.

12. The complaint alleges (paragraph VII (n)) that under the charter Steelworkers "agreed and undertook to represent the members of the said Federal Labor Union, guaranteed that plaintiffs and other members of the Federal Labor Union would receive substantial benefit by reason of the affiliation with the membership; that they would never withdraw individual membership of any member except for cause; that they would never withdraw the charter for any reason; that members would continue their employment at the Carrier Corporation plant in Syracuse; that in the event of a strike, lock out, or other labor difficulty the plaintiffs and other members of the Federal Labor Union's job security would be protected; that the plaintiffs and other members of the Federal Labor Union would be the beneficiaries of the funds of the United Steel Workers International AFL-CIO in the event of labor difficulties at Carrier Corporation plant in Syracuse; that representatives of the Steel Workers International AFL-CIO and its legal advisors would in no way agree or allow any decrees, judgments, stipulations to interfere with the plaintiffs' employment rights and that each individual member of the said Federal Labor Union would be backed by the full resources of the Steel Workers International AFL-CIO and in no event be deprived of his employment."

Later in the complaint (paragraph X (a)), plaintiffs alleged that under the "charter and by-laws" Steelworkers agreed "to protect the rights of the members of the local union, represent them diligently, fairly and in good faith in any negotiations or proceedings in court or before the NLRB and to afford them the benefit of the funds of the International Union in the event of work stoppage due to industrial strife."

a charter *per se* or a charter and by-laws alone constitute a "contract" sufficient to support § 301 jurisdiction, although there is ample support for the proposition that a Constitution of an International Union constitutes a contract between that International and its Local sufficient to confer such jurisdiction. Parks v. International Brotherhood of Electrical Workers, 314 F.2d 886 (4th Cir. 1963), cert. denied, 372 U.S. 976, 83 S.Ct. 1111, 10 L.Ed.2d 142 (1963). See also Welch v. Breckenridge, 284 F.Supp. 125 (W.D.Ark.1968); Brotherhood of Painters, Decorators and Paperhangers of America, AFL–CIO v. Brotherhood of Painters, Decorators and Paperhangers of America, AFL–CIO, Local Union No. 127, 264 F.Supp. 301 (N.D.Cal.1967); Burlesque Artists Association v. American Guild of Variety Artists, 187 F. Supp. 393 (S.D.N.Y.1958).

The Steelworkers standard form of charter is on its face merely a broadly drawn certificate of affiliation, providing that "such rights and privileges as may from time to time be determined" by Steelworkers will inure to the benefit of Local 5895 conditioned upon the latter's compliance with "the rules, regulations, and laws for Local Unions duly adopted by the United Steelworkers of America." Whether such a local union charter standing alone without reference to the constitution of the international may form the basis for a contract action under § 301 is open to grave doubt. See

Note, Applying the "Contracts Between Labor Organizations" Clause of Taft-Hartley Section 301: A Plea for Restraint, 69 Yale L.J. 299, 306–7 (1959). But since appellants have pleaded in detail the rights and privileges they claim are secured by the charter [13] (which do not appear on the face of the standard form) and the violations of such rights and privileges,[14] they should be given an opportunity to prove the same. Accordingly, we cannot conclude that the claim should be dismissed upon this ground.

■ There is one other difficulty associated with appellants' § 301 claim based on the charter, namely, the issue of appellants' standing to sue on this basis at all. Plaintiffs individually were not parties to the charter, and their asserted right to bring suit can only derive from their status as third-party beneficiaries, the charter benefits running in the first instance to Local 5895. In this posture plaintiffs, before bringing an action for breach of the charter upon the claim that it is a contract, must first allege that Local 5895 has wrongfully and in bad faith refused, after proper demand, to request Steelworkers for aid and assistance pursuant to the alleged obligations existing under the charter; or, in the alternative, they must allege that such a demand would have been futile. Cf. Vaca v. Sipes, *supra;* Desrosiers v. American Cyanamid Co., *supra.* As the failure to so allege may have been no more than error in pleading and since

---

13. See fn. 12.

14. The complaint also alleges (paragraph X(a)): "The United Steel Workers of America breached that contract beginning in the middle part of March 1960 by failing adequately and fairly to represent the members of Local Union 5895 in good faith in the proceedings before the court and the NLRB arising from the industrial strife precipitated by the March 2, 1960, lock out by Carrier Corporation. Breaches have continued from that time to the present time and include, among other things, failure to adequately and fairly represent the membership of Local Union 5895 in good faith, including plaintiffs in this action in the industrial strife arising from the lock out of March 2, 1960, by

Carrier Corporation; in refusing to afford to the membership of Local Union 5895, and especially to the plaintiffs in this action, the benefit of the funds available to the international union for the purpose of assisting the local unions in their industrial problems with management; in abandoning plaintiffs and the other remnants of Local Union 5895 on November 30, 1961, such abandonment being complete and being a calculated and deliberate capitulation to the wanton, malicious and willful industrial warfare waged by Carrier Corporation and Sheet Metal International and Local Unions to oust Local Union 5895 as the collective bargaining representative of the production and maintenance workers of the Syracuse plant of Carrier Corporation."

we are permitting amendments in other respects, appellants should be granted the opportunity to redraft their complaint on this point as well.

### § 301 Claim Against Sheet Metal Workers and Local 527

The predicate for these claims is paragraph 12 of the Agreement Among the Internationals, referred to as a "no-raiding" agreement, to which both Sheet Metal Workers and Steelworkers were signatories, reading:

"When an International Union is chosen to represent the members of the Carrier Corporation, the other International Unions signator to this Agreement will not intervene or be a party to any National Labor Relations Board Election."

This raises an issue of both jurisdiction and enforceability, upon which there has been no clearcut decision. In United Textile Workers of America, AFL–CIO v. Textile Workers Union of America, 258 F.2d 743 (7th Cir. 1958), the Seventh Circuit held that an arbitration award pursuant to a no-raiding agreement was enforceable, while two years later Judge Mathes of the District Court of California decided in International Union of Doll & Toy Workers of United States and Canada, AFL–CIO v. Metal Polishers, Buffers, Platers & Helpers International Union, AFL–CIO, 180 F.Supp. 280 (S.D. Cal.1960), that, with due respect to United Textile Workers and the literal reading of § 301(a), the Congressional policy developed under the National Labor Relations Act conferred exclusive jurisdiction over such agreements upon the NLRB and that the district court therefore lacked jurisdiction to enforce the same. As a matter of practice, the NLRB has refused to automatically enforce such agreements upon the ground that to do so "would permit a private resolution of the question concerning representation in a manner contrary to the policies of the [National Labor Relations] Act and would impinge upon the Board's exclusive jurisdiction and authority to resolve such questions of rep-

resentation." Great Lakes Industries, Inc. (Cadmium & Nickel Plating Div.), 124 NLRB 353 (1959). Subsequently, in 1962, the Supreme Court in Retail Clerks International Association, supra, cited United Textile Workers as an example of labor contracts other than collective bargaining agreements subject to § 301 jurisdiction. In an entirely different context, we noted in Lodge 743, International Association of Machinists, AFL–CIO v. United Aircraft Corporation, 337 F.2d 5 (2d Cir. 1964), cert. denied, 380 U.S. 908, 85 S.Ct. 893, 13 L.Ed.2d 797 (1965), that the same Court of Appeals which decided United Textile Workers seriously questioned the blanket enforceability of no-raiding agreements notwithstanding § 301 jurisdiction (National Labor Relations Board v. Weyerhaeuser Company, 276 F.2d 865 (7th Cir. 1960), cert. denied, 364 U.S. 879, 81 S.Ct. 168, 5 L.Ed.2d 102 (1960)), and prior thereto we remarked in Local 33, International Hod Carriers, etc. v. Mason Tenders, etc., supra, 291 F.2d at 503, that the enforcement of a no-raiding agreement pursuant to § 301 may impinge upon the "clearly established activities of the NLRB," requiring the district court to stay its hand.

 We need not, however, attempt to resolve this unsettled issue since it is clear that the appellants, not being signatories to the Agreement, have no standing to sue. Obviously, the Agreement among the five international unions was not made for the benefit of appellants but for the benefit of the particular international emerging victorious in the AFL–CIO election of July 1, 1959. Whatever legally cognizable damage resulted from the entrance of Sheet Metal Workers into the NLRB election of January 7, 1960, or from its continued agitation for membership of Local 5895, or from the certification of Local 527 on November 30, 1961, was suffered by the Steelworkers, which lost members, dues, assessments, and possibly prestige. We can see no possible harm to the appellants except disappointment that a majority of Carrier employees shifted senti-

ment to another union. Of course, this emotional disappointment will not justify a suit against Sheet Metal Workers pursuant to § 301 by individual employees for back pay, reinstatement of employment and union membership, together with damages caused by an allegedly unjust refusal of Carrier to rehire the appellants after a work stoppage.

### LMRDA Claim Against Carrier and Steelworkers

Appellants charge Carrier and Steelworkers with violating their rights under § 101 et seq. of the LMRDA, the Bill of Rights of Members of Labor Organizations. Essentially, the Bill of Rights is addressed to the regulation of the internal affairs of the union, insuring to members equal rights and freedom of speech in the conduct of union affairs, and due process in disciplinary proceedings.

■ Relying upon Thompson v. New York Central Railroad Company, 361 F. 2d 137 (2d Cir. 1966), Judge Port held that the allegations of the complaint did not confer subject-matter jurisdiction over Carrier. In the *Thompson* case, the dismissal by the district court of the employees' claim charging conspiracy of the employer with the union, was affirmed. We said there: "Thus it has been consistently held that the Labor-Management Reporting and Disclosure Act regulates only the relationship between the union and its members and not that between an employer and his employees." *Id.*, at 145. In a similar case in the Fourth Circuit, Duncan v. Peninsula Shipbuilders Association, 394 F.2d 237, 240 (4th Cir. 1968), the court in upholding the dismissal of a similar complaint, stated: "But even if the plaintiff did count on collaborative conduct of the union and the employer, the union alone can be held for its conspiratorial part, without holding the other plotter." See also, Fanning v. United Scenic Artists, Local 829 of Brotherhood of Painters, Decorators and Paperhangers of America, AFL–CIO, 262 F.Supp. 655 (S.

D.N.Y.1967); Rinker v. Local Union No. 24 of Amalgamated Lithographers of America, 201 F.Supp. 204 (W.D.Pa. 1962), appeal dismissed, 313 F.2d 956 (3d Cir. 1963); Fogg v. Randolph, 244 F.Supp. 885, 888 (S.D.N.Y.1962). Jurisdiction over an employer comes from § 301 and where, as here, the only basis for jurisdiction over Carrier under the LMRDA is an allegation of employer-union conspiracy to violate rights protected by that Act, the union alone may be held and the jurisdictional defect cannot be circumvented by a conspiracy allegation.

■ A similar Bill of Rights claim asserted against Steelworkers was dismissed by Judge Port because of the conclusory nature of the allegation. The complaint charges that Steelworkers' violations of the Act "include, but are not limited to the activities described in paragraph VII of this amended complaint." This paragraph consists of thirty-eight subparagraphs constituting an elaborate and prolix chronicle of the totality of events surrounding the industrial turmoil at Carrier's plant. Title I of the LMRDA is not a catch-all into which might be swept all manner of miscellaneous charges without any specificity. Scovile v. Watson, 338 F.2d 678, 681 (7th Cir. 1964), cert. denied, 380 U.S. 963, 85 S.Ct. 1107, 14 L.Ed.2d 154 (1965); Green v. Local 705, Hotel and Restaurant Employees' and Bartenders' International Union, AFL–CIO, 220 F.Supp. 505 (E.D.Mich.1963). The otherwise bald assertion that the Act has been violated does not disclose a specific infringement which would justify the maintenance of the action. Were this the only claim set out in the complaint, we would be inclined to affirm its dismissal because of its almost complete lack of substance as drafted. However, as the appellants are to be granted one final attempt to state with clarity their allegations on certain other points, there is little reason why they should not be granted the same opportunity in connection with their alleged LMRDA claim against Steelworkers, in reliance on the assumption that

any such redrafted allegation will state in *clear and concise language* exactly which sections of the LMRDA have been breached and what damage appellants have suffered thereby.

### Breach of Duty of Fair Representation Against Steelworkers

In paragraph X(d) of the complaint appellants seek to charge Steelworkers with a breach of its duty of fair representation. Apart from the fact that this paragraph defies normal grammatical interpretation, it very closely approaches a recitation of mere conclusions of law, insufficient under Rule 8(a), Fed.R.Civ. Proc., 28 U.S.C., Slagey v. Illinois Central Railroad Co., 397 F.2d 546, 552 (7th Cir. 1968). Yet, since there is an allegation of bad faith, Simberlund v. Long Lsland Rail Road Co., 421 F.2d 1219 (2d Cir. 1970), and in light of our duty to liberally construe fair representation claims, Czosek v. O'Mara, 397 U.S. 25, 90 S.Ct. 770, 25 L.Ed.2d 21 (1970), the complaint can be read as raising a claim that Steelworkers violated its duty to represent the appellants fairly.

The district court nevertheless dismissed the fair representation claim on the theory that it was time-barred. In so holding the district court found that "the duty of fair representation is a fiduciary obligation," and applied the three-year limitation period provided in N.Y. CPLR § 214(4). Even if the facts are assumed to be those most favorable to appellants, more than three years had elapsed before the suit was commenced and therefore the claim was dismissed. While we agree that the district court properly looked to New York State law in determining the limitation period, we disagree as to the particular statute which applies and conclude that the unfair representation claim against the Steelworkers was not time-barred.

■ The union's duty of fair representation, first enunciated by the Supreme Court in Steele v. Louisville & Nashville Railroad Co., 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944), requires the exclusive bargaining representative "to serve the interests of all members without hostility or discrimination toward any." Vaca v. Sipes, *supra*, 386 U.S. at 177, 87 S.Ct. at 910. This duty was derived from a union's statutory right to be the exclusive representative of the members of a designated unit, from which the Supreme Court found an implied statutory obligation to give members equal representation. See Ford Motor Co. v. Huffman, 345 U.S. 330, 73 S.Ct. 681, 97 L.Ed. 1048 (1953). The duty of fair representation is thus a federal obligation which has been judicially fashioned from national labor statutes.

■ In the case of federal rights created by statute, the traditional rule has long been that the district court is to look to the law of the state where it sits to determine the appropriate limitation period when no such limitation has been provided by Congress. McCluny v. Silliman, 28 U.S. (3 Pet.) 270, 276–277, 7 L.Ed. 676 (1830); International Union, United Automobile, Aerospace, Agricultural Implement Workers of America (U.A.W.) AFL–CIO v. Hoosier Cardinal Corp., 383 U.S. 696, 86 S.Ct. 1107, 16 L. Ed.2d 192 (1966); Moviecolor Ltd. v. Eastman Kodak Co., 288 F.2d 80, 83 (2d Cir. 1961), cert. denied, 368 U.S. 821, 82 S.Ct. 39, 7 L.Ed.2d 26 (1961). Recognizing as we do the problems of non-uniformity outlined in Mr. Justice White's dissent in *Hoosier Cardinal, supra*, 383 U.S. at 709–714, 86 S.Ct. 1107, we can nevertheless see no grounds for distinguishing a right forged by judicial interpretation from one expressly created by Congressional enactment and hold that the district court's decision to turn to state law was correct. See Gray v. International Ass'n of Heat & Frost Insulators, 416 F.2d 313, 316 (6th Cir. 1969).

■ In determining which state limitation period is applicable in the case of a wholly federal right, it is for the federal court to consider the character of the claim involved, and give effect to the nature and purpose of the federal

act from which the claim derives and to the federal objectives pursued. See Moviecolor Ltd. v. Eastman Kodak Co., *supra,* 288 F.2d at 83–84; Romer v. Leary, 425 F.2d 186 (2d Cir. 1970). Therefore while the duty of fair representation is a "fiduciary" obligation in the sense that the union is bound to act in good faith with regard to the interests of its members, this label should not necessarily control the legal relationships of the parties for all purposes. The union's obligation here involved does not fall within the category of orthodox fiduciary relationships. The label "fiduciary relationship" is merely a shorthand description for a number of obligations flowing from the union to member, and it is preferable, at least for limitation purposes, that the characterization of the duty of fair representation reflect the actual substance of the duty owed.

In the present case appellants' claim is essentially that Steelworkers unjustifiably refused to try to enforce the rights provided for them in the labor contract with Carrier—in particular, the right not to be wrongfully discharged. The duty of the union to its members in this regard is tied to the contractual obligations of Carrier to the union as representative of the employees and therefore resembles right-duty relationships between contracting parties, where one is bound to use good faith or its best efforts on behalf of the other. Thus the unfair representation claim against Steelworkers in this court is intimately related to the § 301 claim against Carrier since both stem from the unauthorized discharge of the appellants contrary to the terms of the labor agreement. Even though these are two distinct rights capable of separate vindication, see

Czosek v. O'Mara, *supra,* because of their interrelated nature, it would seem appropriate to apply the same limitation period to both claims. Indeed, in proving their case against Carrier appellants will of necessity "prove that the union as bargaining agent breached its duty of fair representation in its handling of the employee[s'] grievance." Vaca v. Sipes, *supra,* 386 U.S. at 186, 87 S.Ct. at 914. Therefore the traditional argument for a short limitation period, that claimants should not be permitted to bring actions based on stale evidence long after the parties had a right to assume that the claim would not be pursued, is simply inapplicable; no matter what the disposition of the claim against the union, the claim against the employer, based on the same evidence, will still go forward. And as the Supreme Court noted in Vaca v. Sipes, *supra* at 187, 87 S.Ct. at 915, there would be no sense "in a rule which would permit a court that has litigated the fault of employer and union to fashion a remedy only with respect to the employer" and again at 188, fn. 12, 87 S.Ct. at 915, "* * * These remedy problems are difficult enough when one tribunal has all parties before it; they are impossible if two independent tribunals, with different procedures, *time limitations,* and remedial powers, must participate." (Emphasis added.)

We therefore hold that when a § 301 suit is brought against an employer alleging breach of the collective bargaining agreement in conjunction with a claim that the union breached its fair representation duty to pursue the employee's grievance, the same period of limitations should be applied to both claims.[15] In the present case, the proper

15. It is again to be emphasized, however, that it does not follow that the limitation period for breach of contract and contract-related claims will apply to all suits brought against a union by a disgruntled member which are nominally classified within the fair representation rubric. In each instance the nature of the alleged act of commission or omission on the part of the defendant union must be examined

to determine the appropriate federal characterization for statute of limitations purposes. We therefore express no opinion as to whether, given allegations other than that the union refused to enforce the employees' contract rights, we might adopt the "statutory duty" characterization of Gray v. International Ass'n of Heat & Frost Insulators, 416 F.2d 313, 316 (6th Cir. 1969), the tort characterization of

limitation period to be applied to the contract claim against Carrier is the six-year limitation set out in N.Y. CPLR § 213(2) for "an action upon a contractual obligation or liability express or implied." Auto Workers Union v. Hoosier Cardinal Corp., *supra,* 383 U.S. at 705–708, 86 S.Ct. 1114. As this is the relevant limitation period, we hold that the claim against Steelworkers was improperly dismissed as untimely, because even the earliest date from which Steelworkers asserts the period would run, falls within the six-year limitation.

It is nevertheless necessary that appellants' complaint be redrafted on this claim as well, for as we noted above, the allegations are currently drafted with such a lack of clarity and precision that the unfair representation claim has barely been set out. In redrafting this portion of the complaint, appellants should be particularly mindful of Vaca v. Sipes, *supra,* and the pleading requirements set out therein.

### *Preempted Claims Against Carrier, Steelworkers and Sheet Metal Workers*

■■ In their complaint appellants include a number of rather ambiguous allegations against the defendants which most generously construed, set forth claims that fall within the doctrine of preemption. For instance, they allege that Carrier, Sheet Metal Workers and Local 527 were guilty of a campaign of industrial warfare to oust Local 5895 as collective bargaining representative, culminating in the withdrawal of Local 5895's charter on November 30, 1961, and also that Carrier, Sheet Metal Workers and Local 527 blacklisted appellants and prevented their employment by other employers because of appellants' concerted activity during the strike. In San Diego Building Trades Council, Millmen's Union, Local 2020 v. Garmon, 359 U.S. 236, 245, 79 S.Ct. 773, 780, 3 L.Ed.2d 775 (1959), the Supreme Court held: "When an activity is arguably subject to

§ 7 or § 8 of the [National Labor Relations] Act, the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board if the danger of state interference with national policy is to be averted." Here both of these charges are "arguably subject to § 7 or § 8 of the Act" (e.g., Cone Brothers Contracting Company, 135 NLRB 108 (1962) [blacklisting of employee for strike activity held to be unfair labor practice]), and therefore come within the primary jurisdiction of the National Labor Relations Board, to which this court must defer. See Local No. 207, International Association of Bridge, Structural and Ornamental Iron Workers Union v. Perko, 373 U.S. 701, 83 S.Ct. 1429, 10 L.Ed.2d 646 (1963). In asserting their claim against the Steelworkers, appellants were satisfied in simply alleging that Steelworkers were guilty of unfair labor practices. Without more, this charge is manifestly one preempted to the primary jurisdiction of the Board.

### *Claims Against All the Defendants*

■ The complaint additionally alleges a plethora of conspiracy claims against all the defendants, charging them with conspiring to commit the various wrongs charged against each defendant individually. These claims must be dismissed for two reasons. First, there exists no federal statute conferring independent jurisdiction upon the federal courts for claims of civil conspiracy in the labor relations field (see Hall v. Pacific Maritime Association, 281 F.Supp. 54 (N.D.Cal.1968); Cole v. Hall, 35 F.R.D. 4 (E.D.N.Y.1964)), nor does conspiracy to violate either a labor contract or an individual's rights under the LMRDA suffice to vest the courts with jurisdiction pursuant to § 301 of the LMRA or § 102 of the LMRDA, respectively. See Aacon Contracting Co. v. Association of Catholic Trade Unionists, 178 F.Supp. 129 (E.D.N.Y.1959), affirmed, 276 F.2d 958 (2d Cir. 1960); Curtis

de Arroyo v. Sindicato de Trabajadores Packinghouse, 425 F.2d 281, 1st Cir.,

1970, or some other appropriate classification.

Bay Towing Company of Pennsylvania v. National Maritime Union of America, 206 F.Supp. 741 (E.D.Pa.1962); Thompson v. New York Central Railroad Co., *supra;* Duncan v. Peninsula Shipbuilders Association, *supra.* Second, we find no authority creating a common law federal tort based upon an allegation of conspiracy alone.

The allegation of "conspiracy" is nothing more than a makeweight which adds nothing to the substance of the allegations against the individual defendants. There was therefore no impropriety on the part of the district court in dismissing such superfluous portions of the complaint.

■■■ Among the many conspiracy charges in the complaint is one which attempts to articulate a conspiracy to wrongfully deny appellants membership in Local 527. Appellants also set forth a separate claim against Sheet Metal Workers and Local 527 of wrongful denial of membership which should be considered at the same time. Wrongful denial of union membership does not come within the ambit of either § 301 of the LMRA or § 102 of the LMRDA.[16] Nor is the right to union membership equivalent to the right to fair representation, for the latter exists independent of the former and extends to union members and non-members alike, so long as the employees are in the bargaining unit. Steele v. Louisville & N. R. Co., *supra.* But appellants have not charged Sheet Metal Workers or Local 527 with the breach of their duty of fair representation. Therefore, both the individual claim against Sheet Metal Workers and Local 527 as well as the conspiracy claim against all the defendants respecting the unjust denial of union membership, must be dismissed.

### Pendent State Claims

■■■ Charging Carrier, Sheet Metal Workers and Local 527 with

malicious libel and slander of the appellants in connection with the latter's union activities, appellants invoke the pendent jurisdiction of this court. While this type of conduct may arguably constitute an unfair labor practice, the Supreme Court has said that the State interest for the protection of its residents from such tortious conduct is so compelling that State jurisdiction should be permitted. Linn v. United Plant Guard Workers of America, Local 114, 383 U.S. 53, 61, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966). The doctrine of pendent jurisdiction is a doctrine of discretion and not of a plaintiff's right. Only if the federal claim has sufficient substance to confer subject-matter jurisdiction and both the State and federal claims derive from a common nucleus of operative facts should the federal court exercise its pendent jurisdiction in order to try all claims in one judicial proceeding. United Mine Workers of America v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); Yanity v. Benware, 376 F.2d 197 (2d Cir. 1967), cert. denied, 389 U.S. 874, 88 S.Ct. 167, 19 L.Ed.2d 158 (1967). In view of the fact that the district court dismissed all the federal claims, its refusal to exercise pendent jurisdiction over any charges of malicious libel and slander as well as any other causes of action cognizable under State law that might be spelled out from the allegations of conspiratorial conduct previously discussed, was clearly warranted.

As we are permitting appellants to replead certain portions of the complaint, the district court nevertheless may wish to reconsider the pendent jurisdiction issue if jurisdiction over any of the federal claims should eventually be sustained.

### Second Cause of Action

Since the second cause of action, charging the defendants with deliberate ouster of appellants from union membership and job employment, essentially dupli-

---

16. In fact, § 8(b) (1) of the NLRA provides that while it is an unfair labor practice for a union to restrain or coerce employees in the exercise of § 7 rights, "this paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership."

cates the first cause of action, and fails to set forth any additional basis of jurisdiction and does not otherwise state any additional claims upon which relief can be granted, dismissal by the district court of this portion of the complaint was also correct.

On remand the appellants are granted leave to file, within 30 days of the judgment of this court, an amended complaint for the purpose of restating their § 301 claim against Carrier and their § 301, § 101 and unfair representation claims against Steelworkers to correct the deficiencies above discussed.

The case is remanded to the district court for further proceedings in accordance with this opinion. It is so ordered.